## CONNALLY v. GEORGIA

No. 76–461.   Decided January 10, 1977

PER CURIAM.

Appellant John Connally was indicted, tried, and convicted in the Superior Court of Walker County, Ga., for possession of marihuana in violation of the Georgia Controlled Substances Act, Ga. Code Ann. § 79A–801 *et seq.* (1973).   On his appeal to the Supreme Court of Georgia, he asserted trial error in four respects: the constitutional impropriety of the fee system governing the issuance of search warrants by justices of the peace in Georgia; the deprivation of his right of confrontation when revelation of an informer's identity was refused; the failure to give a requested instruction on joint occupancy of premises; and the failure to enter a judgment of acquittal because of an alleged absence of proof of the type of cannabis involved.   The Supreme Court of Georgia affirmed, with two justices dissenting (one on the first issue) and one justice concurring as to the second, third, and fourth issues and in the judgment.   237 Ga. 203, 227 S. E. 2d 352 (1976).   The appellant, on direct appeal here,[1] raises

---

[1] Cf. *Stone* v. *Powell,* 428 U. S. 465 (1976).

the first two questions. We deem the challenge to the warrant procedure worthy of consideration.

Pursuant to a search warrant issued by a justice of the peace, appellant's house was raided and marihuana found there was seized. Connally was arrested. At his trial he moved to suppress the evidence so seized on the ground that the justice who had issued the warrant was not "a neutral and detached magistrate" [2] because he had a pecuniary interest in issuing the warrant. The trial court denied that motion, and the Supreme Court of Georgia, in affirming, rejected the constitutional challenge.

Under Ga. Code Ann. § 24–1601 (1971), the fee for the issuance of a search warrant by a Georgia justice of the peace "shall be" $5, "and it shall be lawful for said [justice] of the peace to charge and collect the same." If the requested warrant is refused, the justice of the peace collects no fee for reviewing and denying the application. The fee so charged apparently goes into county funds and from there to the issuing justice as compensation.

At a pretrial hearing in Connally's case, the issuing justice testified on cross-examination that he was a justice primarily because he was "interested in a livelihood," Record 502; that he received no salary, *ibid.;* that his compensation was "directly dependent on how many warrants" he issued, *ibid.;* that since January 1, 1973, he had issued "some 10,000" warrants for arrests or searches, *ibid.;* and that he had no legal background other than attendance at seminars and reading law, *id.,* at 506–508, 512–515.[3]

---

[2] See *Johnson* v. *United States,* 333 U. S. 10, 14 (1948); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 453 (1971); *Shadwick* v. *City of Tampa,* 407 U. S. 345, 350 (1972).

[3] "Q In the case of a search warrant, I believe you receive compensation ultimately in the amount of $5.00, if you issue the warrant, do you not?

"A That's true.

Fifty years ago, in *Tumey* v. *Ohio,* 273 U. S. 510 (1927), the Court considered state statutes that permitted a charge of violating the State's prohibition laws to be tried without

"Q If you choose not to issue the warrant, what compensation do you receive?

"A I don't know.

"Q You receive no compensation?

"A Well, I never have, I'll put it that way.

"Q Now with respect to issuing the search warrant, Mr. Murphy, does the $5.00, since that's the only way you get paid, does that enter your mind when you're sitting there contemplating whether or not to issue a search warrant?

"A It has.

"Q As a matter of fact, I believe you quite honestly and candidly told me on the day we had that preliminary hearing up here, I believe that was on, the best I can recall, it was on the 18th of May, that you would be a liar if you said it didn't enter your mind?

"A That's what I said.

"Q Is that true now, you would be [a] liar if you said it didn't enter your mind?

"A It's only human nature to me.

.          .          .          .

"Q Okay. Now, I believe you said you had been a J. P. since January 1st of 1973, is that correct?

"A Yes, sir.

"Q All right. Now, since January—you have to run for that office, or is it an appointed office?

"A Yes sir, it's an elected office.

"Q Well, you ran for the office for the purpose of having employment and earning a living, is that correct?

"A That's part of it.

"Q Of course, you like in other people's motivations, primarily you were interested in a livelihood?

"A True.

"Q Now do you support yourself with the salary or with the fees that you receive in a J. P. system down here, or as J. P.?

"A Uh huh, yes sir.

"Q And you receive no salary at all, so that your compensation is directly dependent on how many warrants you issue, is that correct?

248

a jury before a village mayor. Any fine imposed was divided between the State and the village. The latter's share was used to hire attorneys and detectives to arrest offenders and

---

"A That's right.

"Q Now, since January 1st, 1973, I believe you told me the other day, and let me ask you again, you have issued some 10,000 warrants of the arrest—either arrest or search warrants, is that correct?

"A That's pretty close, total warrants.

"Q Okay. Total warrants?

"A Criminal warrants.

"Q That would be right about 10,000 of them?

"A Uh huh.

. . . . .

"Q Now with respect to the qualifications that you have for your office, of course, the people of Walker County elected you and under the law that would qualify you, but I believe the law prescribes some qualifications that you must have prior to the time you are elected, what are those qualifications?

"A You have to be a resident of the militia district in which you're running for that office, registered voter, it might sound stupid but that's all I remember.

. . . . .

"Q Okay. Now of course, the people have selected you as the J. P. for this militia district, and you have the qualifications that you mentioned that you are a resident and of age and so on and so forth, other than those, do you have any background, legal background or other background with respect to the instruments and issuance of warrants?

"A No, sir.

"Q So, the qualifications that you have mentioned are your sole qualifications for holding your job, is that correct?

"A That's right.

"Q Okay.

"A Up to the time I was elected.

"MR. DANIEL: Okay, sir, that's all I have.

"THE COURT: Have you done anything since you were elected to improve any qualifications that might be necessary?

"THE WITNESS: Yes, sir.

"THE COURT: What have you done?

"THE WITNESS: I have attended several training seminars sponsored by our J. P. State Association, as a matter of fact, I'm leaving

prosecute them before the mayor. When the mayor convicted, he received fees and costs, and these were in addition to his salary. The Court, in an opinion by Mr. Chief Justice Taft, unanimously held that subjecting a defendant to trial before a judge having "a direct, personal, pecuniary interest in convicting the defendant," that is, in the $12 of fees and costs imposed, id., at 523, 531, effected a denial of due process in violation of the Fourteenth Amendment.

This approach was reiterated in *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972). There, an Ohio statute authorized mayors to sit as judges of ordinance violations and certain traffic offenses. The petitioner was so convicted and fined by the mayor of Monroeville. Although the mayor had no direct personal financial stake in the outcome of cases before him, a major portion of the village's income was derived from the fines, fees, and costs imposed in the mayor's court. This Court, id., at 59–60, cited *Tumey* and repeated the test formulated in that case, namely, "whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused . . . .' " 409 U. S., at 60. *Dugan* v. *Ohio*, 277 U. S. 61 (1928), where a mayor had judicial functions but only "very limited executive authority," and the executive power rested in a city manager and a commission, was distinguished as a situation where "the Mayor's relationship to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as [a] judge," 409 U. S., at 60–61,

---

this afternoon if I can get out of here to go to a 2-day training seminar in Warner Robbins, Georgia, sponsored by the same State Association.

"I've bought one manual, study course from Judson-Pace at my own expense and attempted to learn a little bit more about the duties." Record 499–500, 501–502, 506–508.

and the possibility of a later *de novo* trial in another court was held to be of no constitutional relevance because the defendant was "entitled to a neutral and detached judge in the first instance." *Id.,* at 61–62.

The present case, of course, is not precisely the same as *Tumey* or as *Ward,* but the principle of those cases, we conclude, is applicable to the Georgia system for the issuance of search warrants by justices of the peace. The justice is not salaried. He is paid, so far as search warrants are concerned, by receipt of the fee prescribed by statute for his *issuance* of the warrant, and he receives nothing for his *denial* of the warrant. His financial welfare, therefore, is enhanced by positive action and is not enhanced by negative action. The situation, again, is one which offers "a possible temptation to the average man as a judge . . . or which might lead him not to hold the balance nice, clear and true between the State and the accused." It is, in other words, another situation where the defendant is subjected to what surely is judicial action by an officer of a court who has "a direct, personal, substantial, pecuniary interest" in his conclusion to issue or to deny the warrant. See *Bennett* v. *Cottingham,* 290 F. Supp. 759, 762–763 (ND Ala. 1968), aff'd, 393 U. S. 317 (1969).

*Shadwick* v. *City of Tampa,* 407 U. S. 345 (1972), does not weigh to the contrary. The issue there centered in the qualification of municipal court clerks to issue arrest warrants for breaches of ordinances. The Court held that the clerks, although laymen, worked within the judicial branch under the supervision of judges and were qualified to determine the existence of probable cause. They were, therefore, "neutral and detached magistrates for purposes of the Fourth Amendment." *Id.,* at 346. There was no element of personal financial gain in the clerks' issuance or nonissuance of arrest warrants. Cf. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 449–453 (1971).

We disagree with the Supreme Court of Georgia's rulings, 237 Ga., at 205–206, 227 S. E. 2d, at 354–355, that the amount of the search warrant fee is *de minimis* in the present context, that the unilateral character of the justice's adjudication of probable cause distinguishes the present case from *Tumey*, and that, instead, this case equates with *Bevan* v. *Krieger*, 289 U. S. 459, 465–466 (1933), where a notary public's fee for taking a deposition was measured by the folios of testimony taken.

We therefore hold that the issuance of the search warrant by the justice of the peace in Connally's case effected a violation of the protections afforded him by the Fourth and Fourteenth Amendments of the United States Constitution. The judgment of the Supreme Court of Georgia is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*