OPINION OF THE COURT
Irving Lang, J.
The defendants, specialists on the American Stock Ex *620 change (AMEX), have moved to dismiss indictments on multiple grounds. These indictments arise from the same alleged criminal activity, namely, entering options trades in the transaction journal of the AMEX when, in fact, no such trades ever occurred. All the defendants are charged with violations of both the Martin Act (General Business Law, § 352-c) and falsifying business records in the second degree (Penal Law, § 175.05). The motions have accordingly been consolidated for purposes of oral argument and determination.
The numerous grounds alleged for dismissal range from the substantial to the scurrilous. Two of the novel and substantial issues raised are: (1) whether the Martin Act requires intent to defraud to sustain a criminal prosecution; and (2) the legal significance of a Grand Jury’s voting a true bill and then recommending that the indictment not be prosecuted further.
The arguments for dismissal fall into seven broad categories: (1) the indictments or counts thereof are defective; (2) defects in the Grand Jury proceedings; (3) legally insufficient evidence before the Grand Jury; (4) double jeopardy; (5) discriminatory enforcement; (6) violation of the defendants’ privilege against self incrimination, and (7) the interests of justice. In connection with those branches of the motion dealing with the Grand Jury proceedings, the court has reviewed the Grand Jury minutes in camera.
THE MARTIN ACT
The major point raised regarding those counts charging violations of the Martin Act (General Business Law, § 352-c) is that the statute requires an intent to defraud and no evidence of that intent was presented to the Grand Jury. After a careful review of the legislative history of section 352-c of the General Business Law the court concludes that no intent to defraud is required for a violation of the statute. The section, insofar as it is germane to this case, reads as follows: "1. It shall be illegal and prohibited for any person * * * to use or employ any of the following acts or practices: [a] Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale * * * where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase * * * of any securities * * * regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.” (Emphasis added.)
The statute, on its face, is directed at acts or practices, and *621 not at any particular mental state on the part of the actor. Moreover, it clearly does not require several of the common-law elements of fraud, namely, reliance and scienter (General Business Law, § 352-c, subd 1, par [c]). The court, on this basis alone, would be constrained to find that the statute does not refer to or require intent to defraud; and indeed other courts have so held in civil injunction proceedings or as a collateral issue in a criminal case (see, e.g., People v Federated Radio Corp., 244 NY 33; People v Cadplatz Sponsors, 69 Misc 2d 417; People v Reid, NYLJ, April 20, 1978, p 10, col 5).
In addition, the memorandum by the Attorney-General (NY Legis Ann, 1955, p 133) in support of chapter 553 of the Laws of 1955, which added section 352-c of the General Business Law clearly evinces an intent to make certain designated practices per se fraudulent and criminal.
At one point in the memorandum (supra, p 135) the Attorney-General notes that: "the commission of fraud as deñned in the Martin Act is not made a crime under that Act. While the crimes of larceny, embezzlement, forgery and other felonies would be involved in many security frauds, they require that the prosecutor prove criminal intent, thereby making conviction extremely difficult.” (Emphasis added.) And at another point: "These proposed amendments to the statute are not intended to narrow or to repeal the coverage of prior language but rather they are intended to expressly broaden those acts and practices coming within the condemnation of the statute.”
This amendment was not enacted in a vacuum. The highest court of this State had already interpreted the existing civil provisions of the Martin Act to include "all acts, although not originating in any actual evil design or contrivance to perpetrate a fraud or injury upon others”. (People v Federated Radio Corp., 244 NY 33, 38-39, supra.)
The defense attempts to gloss over this oft-reiterated judicial view by distinguishing between civil injunctive proceedings and criminal proceedings. Suffice it to say that nothing in the statute or its legislative history suggests such a dichotomy. Section 352-c of the General Business Law was clearly enacted to add another weapon, criminal prosecution, to the Attorney-General’s existing arsenal of powers regarding these same practices.
The act clearly serves a legitimate public purpose. If civil injunctive procedures against deceptive practices do not afford sufficient protection to the potential investor, the Legislature *622 can exercise its police powers to subject such practices to criminal sanctions.
Accordingly, the court finds that the counts of the indictments charging misdemeanor violations of the Martin Act are supported by legally sufficient evidence before the Grand Jury.
DUPLICITOUS AND MULTIPLICIOUS
The defendants’ other major point directed to the face of the indictment is that those counts charging over-all schemes during specified time periods are both duplicitous and multiplicious, duplicitous' to the extent that they charge more than one offense during the time periods alleged, and multiplicious in that they charge the same offenses which are the subject of individual counts.
As to those counts being duplicitous, the court finds that they charge but one continuous offense over a period of time pursuant to a single criminal purpose. This is an accepted and acceptable mode of pleading and does not render the counts duplicitous (People v Cox, 286 NY 137).
As to the counts being multiplicious, the activities charged in the "catchall” counts are, indeed, the same as those charging single fictitious transactions. This fact, however, does not mandate dismissal, but rather is to be considered for purposes of sentence (People v Mulligan, 29 NY2d 20).
THE GRAND JURY PROCEEDINGS
The defendants attack the Grand Jury proceedings which resulted in the instant indictments on the basic grounds that (1) exculpatory evidence was withheld from the Grand Jury; (2) the prosecutor had a personal stake in the outcome of the proceedings; (3) the legal instructions given to the Grand Jury were improper, and (4) the Grand Jury did not vote on the written indictments.
The allegedly exculpatory evidence which was withheld from the Grand Jury consists of the following: (1) the printing of fictitious trades was widespread; (2) there was a possibility of error in the schedules of fictitious trades, and (3) the defendants had previously been disciplined for the same conduct by the AMEX and by the Securities and Exchange Commission.
As to the first point, the Grand Jury was well aware that this practice was widespread, as is evident from the Grand *623 Jury minutes where the following question of a witness from the AMEX appears: "Q. The second question from a grand juror is, the grand jury has heard testimony that approximately all of the specialists on the floor of the American Stock Exchange with respect to options were gaming [sic, should probably be engaging] in the practice of putting on fictitious trades. The question from the grand juror is if this was going on and it was so widespread how come you have no knowledge of it or didn’t hear about it?”
As to the second point the Grand Jury received testimony regarding the possibility of error.
As to the third point, the introduction of evidence that AMEX disciplinary panels had already found these defendants guilty of the self same practices which were the subject of the Grand Jury’s inquiry would have been highly prejudicial, not exculpatory. If such a course of action had been taken, the defendants would justifiably be moving to dismiss because of the prejudicial effect of the prior adjudication of guilt. The defense obviously now wishes that this evidence had been submitted in the hope that the Grand Jury would have exercised its power to refuse to indict even in the face of legally sufficient evidence. The defendants might have achieved this result by waiving immunity and testifying before the Grand Jury. Having elected not to do so they cannot complain regarding their own tactical decisions.
The first two points are somewhat blurred together in the affidavit of one defense counsel in support of the motion, in which the other defense counsel has joined.
At page 10 of that affidavit, there is a clear implication that the exculpatory evidence was withheld, and these cases were presented to the Grand Jury because it would redound to the pecuniary benefit of the Special Assistant Attorney-General who supervised this investigation.
The Special Assistant Attorney-General in question is only one of many Assistant Attorneys-General assigned to this case. Upon leaving the Attorney-General’s office, this assistant was requested to continue this investigation, which had already commenced. Not unreasonably, the Special Assistant Attorney-General is to be paid for his work. It is upon this flimsy thread that the defense weaves its dismissal motion, alleging that his pecuniary interest in prolonging the litigation vitiates the proceedings. This is absurd. Followed to its illogical conclusion, no special prosecutor could be engaged to
*624 handle a case except as a volunteer. The cases cited by the defense in support of this contention are clearly distinguishable (Connally v Georgia, 429 US 245; Tumey v Ohio, 273 US 510; Ward v Village of Monroeville, 409 US 57). In those cases, the judicial officers had a financial stake in a result favorable to the prosecution. In Tumey, for example, the Mayor-Magistrate received costs upon a conviction but not an acquittal. In Connally, the Justice of the Peace got $5 for signing a search warrant and nothing if he didn’t. In Ward, fines imposed by the Mayor-Magistrate represented a substantial portion of the locality’s revenues. There is no evidence that the Attorney-General will not pay the Special Prosecutor in the event of an acquittal or dismissal.
The court finds that exculpatory material was not withheld from the Grand Jury, either intentionally or inadvertently. The court finds the totally unsupported intimation of venality on the part of the prosecutor to be scurrilous and scandalous and beyond the liberal bounds permitted in a vigorous defense effort. The court, accordingly, orders these paragraphs stricken (CPLR 3024).
THE PENAL LAW COUNTS
Regarding the legal instructions given to the Grand Jury, however, there was a serious error which may well have prejudiced the defendants. The crime of falsifying business records, unlike Martin Act violations, specifically requires "intent to defraud” (Penal Law, § 175.05). After a charge to the Grand Jury which failed to in any way define this term, the following appears in the minutes: "A question from a grand juror which is the precise legal definition of fraud. I charge you that the definition I have read you with respect to what constitutes a fraudulent practice under the Martin Act which is the General Business Law of Section 352C [sic] that I read, that is the controlling definition. Okay, I cannot give you another definition.” As has been previously discussed, the Martin Act (General Business Law, § 352-c) does not require an intent to defraud. This erroneous charge, accordingly, removed from the Grand Jury’s consideration the factual issue of whether or not the evidence they had heard established an intent to defraud. The prosecutor’s arguments, inter alia, that evidence presented established an intent to defraud the investing public in general by, for example, showing activity in an *625 option where none existed, despite the lack of financial gain to the defendants, is unpersuasive. This is the very type of activity where intent to defraud would be difficult to prove and which shows the necessary and salutary purposes of the Martin Act.
While the prosecution points to other testimony before the Grand Jury which conceivably could have justified the finding of fraudulent intent, the inadequate and erroneous charge prevented a fair appraisal of that evidence. Accordingly, all counts charging violations of section 175.05 of the Penal Law are dismissed.
Ordinarily, leave to re-present the dismissed counts would be granted. However, if the defendants are acquitted of the Martin Act counts, the Penal Law counts would have to be dismissed and if a conviction resulted under the Martin Act, there would obviously be adequate scope of punishment. No useful purpose could be served by a resubmission of this lengthy proceeding. Accordingly, leave to re-present the Penal Law counts is denied.
Another contention, that the Grand Jury should have been asked to vote on the written indictment, is without merit. While there may be cases in which that would be the appropriate method to proceed, this is not one of those cases. While voting, the Grand Jury had before them documentary exhibits which enumerated all of the transactions in question. It was obviously an informed and considered vote. Under these circumstances, the translation of the vote into a formal indictment is a mere ministerial act (People v Roberts, 76 Misc 2d 887; cf. Gaither v United States, 413 F2d 1061).[1]
DOUBLE JEOPARDY
The defendants contend that the prior disciplinary proceedings conducted by the AMEX and the civil actions commenced by the Securities and Exchange Commission (SEC) constitute prior jeopardy and bar this prosecution. The AMEX proceedings variously resulted in fines, suspensions, and cen *626 sures. The SEC actions resulted in consent decrees, some of which included suspensions.[2]
It is beyond cavil that these administrative proceedings arose from the same conduct which resulted in the instant indictments. It has long been the rule that civil proceedings do not constitute jeopardy (see, e.g., People v Jackson, 20 NY2d 440; CPL 40.30), and even successive criminal proceedings by separate sovereigns have been held not violative of the Federal constitutional prohibition against double jeopardy (United States v Wheeler, US [March 22, 1978], prosecution by Navajo tribal court not a bar to Federal prosecution). Nonetheless, the defense contends that the AMEX proceedings were so punitive in nature as to constitute prior jeopardy (United States v La Franca, 282 US 568). Even the case of People v Dairylea Coop., County Ct, Albany County, Oct. 16, 1975, Harvey, J.) relied upon heavily by the defense, involved action by a State agency and not a private body.
The court notes, at the outset, that while it agrees with the holding in the Dairylea case (supra) which dismissed the indictment on multiple grounds including the interests of justice, it disagrees with that portion which found double jeopardy. The administrative proceedings conducted in that case by the State Department of Agriculture and Markets were not, in this court’s opinion, so punitive in nature as to render them criminal for purposes of double jeopardy. Accordingly the court finds no prior jeopardy to bar these prosecutions.
DISCRIMINATORY PROSECUTION
The defendants’ allegations of discriminatory enforcement lack even colorable merit. The papers completely fail to establish any discriminatory basis for the election to prosecute these defendants and not others. (People v Utica Daw’s Drug Co., 16 AD2d 12.)
STATEMENTS TO AMEX
The defendants also move to suppress the statements made by them to AMEX officials on the grounds that they were involuntarily made. The constitution of the AMEX per *627 mits the suspension or expulsion of any member who refuses or fails to appear and testify before any authorized committee of the Exchange (art 5, § 4). The statements, therefore, were allegedly obtained under threat of loss of livelihood. The defense argues, in the alternative, that the AMEX was acting as an agent of the government (namely, the SEC) or that CPL 60.45 (subd 2, par [a]) renders such a statement inadmissible even if obtained by a private individual.
The court rejects the argument that the broad supervisory powers which the SEC has been given over exchanges’ self-regulation have, in effect, rendered the exchanges governmental agents (see Williams Act, 89 US Stat 97). Supervision and regulation do not imply agency. Since the Fifth Amendment protects only against governmental coercion, the statements taken in the course of the AMEX proceedings do not run afoul of the privilege against self incrimination (United States v Solomon, 509 F2d 863).
New York State law, however, precludes defendants’ statements made to "any person” when obtained by the "use or threatened use of physical force upon the defendant * * * or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of undermining his ability to make a choice whether or not to make the statement.” (CPL 60.45, subd 2, par [a].)
The situation in this case does not fit this definition of "involuntariness” and the factual situation in these cases does not bring them within the purview of the doctrine initially enunciated by the United States Supreme Court in Garrity v New Jersey (385 US 493). The line of cases which have been decided under that doctrine have all clearly indicated that it prohibits the State, not private entities, from offering a citizen the Hobson’s choice between self incrimination or loss of employment. The provision of the AMEX constitution in question here does not speak in terms of the exercise of Fifth Amendment rights and is discretionary with the Exchange in any event. There is nothing on the record to indicate that retaliatory action would or could be taken based on the assertion of the privilege. The motion to suppress and dismiss is denied.
The court has previously indicated that the motions to dismiss in the furtherance of justice will be decided in a separate opinion and on an individual basis.
*628 THE GRAND JURY’S RECOMMENDATION
The final branch of this decision, brought to the attention of defendants by the court relates to the Grand Jury’s recommendation that there be no further prosecution of the defendants.
After deliberating and voting these indictments, the foreman of the Grand Jury made the following statement: "The members of the grand jury feel that having voted a true bill against the specialists on the stock exchange, they consider this to be a very minor matter and recommend that it not be prosecuted further.” The prosecutor and defense counsel, employing talmudic exegesis, have respectively concluded that (1) the foreman meant that these prosecutions were all right but do not bring any more; and (2) the Grand Jury obviously did not understand the consequences of voting a true bill. With due deference to these strained interpretations, the court feels that the foremen and Grand Jury meant, mirabile dictu, exactly what they said. The Grand Jury’s opinion on this matter is a factor which the court will consider on the motions to dismiss in the furtherance of justice. However, the statement is purely precatory (see, e.g., Matter of Sparacio, 61 AD2d 486) and in no way binding upon the prosecutor or this court.

. While defense counsel seem enamoured with the Gaither type of indictment requiring the Grand Jury to vote on a written indictment submitted to it, this court is not convinced that it is any fairer than the usual method of the Grand Jury voting a true bill, the prosecutor preparing an indictment, and the foreman of the Grand Jury signing it and reporting to the court.

. The SEC, in fact, turned over material at the request of the State Attorney-General for "possible criminal prosecution” without recommendation.