### Amanda BURITICA, Plaintiff,

v.

UNITED STATES of America and its Treasury Department and Customs Service; Agent D.E. Quiroz, Badge No 17290; Agent K. Murphy, Badge No 21039; Daniel Vigna; Leslie Bianchi; John Petrin; San Francisco International Airport Medical Group; John Ike, MD; County of San Mateo; Bhupinder Bhandari, MD; and Philip M. Eastman, MD, Defendants.

### No. C–95–3354–VRW.

United States District Court,
N.D. California.

June 12, 1998.

Gregory M. Fox, Bertrand Fox & Elliot, San Francisco, CA, for Plaintiff.

Gail Killefer, U.S. Attorney's Office, San Francisco, CA, for Defendants U.S., D.E. Quinoz, K. Murphy, Daniel Vigna, Leslie Bianchi, Daniel Petrin.

Richard K. Wilson, Hassard Bonnington, Hassard Bonnington LLP, San Francisco, CA, for Defendant San Francisco International Airport Medical Group.

David A. Levy, Ropers Majeski Kohn & Bentley, Redwood City, CA, for Defendant County of San Mateo.

Barry C. Marsh, Hinshaw Winkler Draa & Marsh, San Jose, CA, for Defendant Dr. Bhandari.

Richard K. Wilson, Arlene M. Rosen, Hassard Bonnington LLP, San Francisco, CA, for Defendant John Ike, M.D.

## ORDER

WALKER, District Judge.

Plaintiff Amanda Buritica brings this action alleging various torts and constitutional violations against the United States government, five United States Customs inspectors and several non-federal defendants. Buritica's claims arise out of an incident in which Customs agents detained her at San Francisco International Airport (SFO) because they suspected her of smuggling drugs into the country.

On December 22, 1997, the court issued a lengthy order addressing multiple cross-motions for summary judgment. While the court granted summary judgment for some defendants on certain claims, the court allowed Buritica to proceed to trial with (1) her claims against the government for tort damages as well as declaratory and injunctive relief, (2) her claims against the five Customs inspectors for *Bivens*[1] damages as well as declaratory and injunctive relief and (3) her claims against the non-federal defendants for declaratory and injunctive relief. Pursuant to FRCP 42(b), the court bifurcated the action and indefinitely postponed the trial of Buritica's claims against the non-federal defendants.

Trial of Buritica's claims against the Customs inspectors and the government began on February 9, 1998. Buritica tried her claims for damages and declaratory relief against the Customs inspectors to a jury. At the same time, Buritica tried her claims for injunctive relief against the inspectors as well as all of her claims against the government to the court. After deliberating, the jury returned a unanimous verdict awarding Buritica a total of $451,002.00 in compensatory and punitive damages against four of the five Customs inspectors. Implicit in this verdict was the jury's finding that all of the inspectors save defendant Leslie Bianchi had violated Buritica's constitutional rights. Still pending before the court are Buritica's remaining claims as well as several post trial motions by the federal defendants and the government.

### I

On March 13, 1998, the four Customs inspectors against whom the jury awarded damages (Kerri Murphy, Denise Quiroz, John Petrin and Daniel Vigna) moved for judgments as a matter of law claiming that (1) the evidence does not support the jury's verdict and (2) each inspector is entitled to qualified immunity. Defendants Quiroz and

---

1. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Vigna also moved in the alternative for remittitur and a new trial.

On April 17, 1998, the court held a hearing on these matters. Following the hearing, the court issued an order from the bench denying the motions for judgments as a matter of law. The court ruled that the evidence presented at trial was more than sufficient to support the verdicts and that none of the four Customs inspectors was entitled to qualified immunity.

■ The court also stated that it would deny the alternative motions by Quiroz and Vigna and detail its findings in a written order. In reviewing a defendant's alternative motions for remittitur or a new trial, the court must view the evidence concerning damages in a light most favorable to the prevailing party. See *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir.1983). If, after applying this standard, the court concludes that the award was excessive, it can present the prevailing party with an option. The prevailing party can either agree to submit to a new trial or allow the court to set a reasonable amount of damages. See id.

Quiroz and Vigna argue that Buritica did not present sufficient evidence to justify the jury's $225,000 awards against them. Specifically, they contend that Buritica's lost wages and medical expenses only justified a fraction of these awards. Although Quiroz and Vigna candidly admit that there is no ready touchstone for determining the appropriate amount of emotional distress damages, they contend that the awards are simply too high to be considered "just and reasonable." See Quiroz Mem at 16–17; Vigna Mem at 17. In support of this argument, Quiroz and Vigna point to two other cases in which Customs officers unlawfully detained people who were suspected of internal drug smuggling. Those cases were tried without juries, and the damage awards were considerably smaller than the jury's award in the case at bar. See *Velez v. United States*, 693 F.Supp. 51, 58 (S.D.N.Y.1988); *Reed v. United States*, No C89–1109 VRW.

While Quiroz and Vigna's argument is far from groundless, there are several reasons why the court is not willing to overturn the jury's verdict. First, there is a heavy presumption in favor of this verdict. Second, the evidence clearly supports a finding that Buritica suffered emotional distress and trauma as the result of her detention. Quiroz and Vigna played a central role in this detention and were directly responsible for Buritica's most harrowing experiences. Third, the fact that this court and another court in New York have issued smaller awards in other cases is by no means conclusive. Those cases involved different circumstances and different plaintiffs. Without undue humility, the court suggests that a jury's verdict on the appropriate amount of emotional distress damages may be entitled to greater deference than a court-issued award.

The court therefore denies Quiroz and Vigna's alternative motions for remittitur and new trial.

## II

■ Much as Quiroz and Vigna moved the court to reduce the damage awards against them, Petrin has moved for a judgment as a matter of law on the issue of punitive damages. Petrin claims that there was insufficient evidence presented at trial to support the jury's conclusion that Petrin acted either with malice or in reckless disregard of Buritica's rights. See Jur Instr at 14; see also Ninth Cir Civ Jur Instr 7.5 (1997).

While there may not have been reason for the jury to conclude that Petrin acted with malice, the court finds that there was sufficient evidence to support a finding that Petrin recklessly disregarded Buritica's rights. At the time of Buritica's ordeal, Petrin was the chief inspector. He bore responsibility for the actions of his inspectors, and he had the authority to terminate Buritica's detention if it was no longer reasonable. Nonetheless, Petrin did not thoroughly review the circumstances surrounding Buritica's detention nor did he order her released. The jury could have reasonably concluded that Petrin's inaction constituted a reckless disregard for Buritica's Fourth Amendment right to be free from unreasonable searches and detentions.

In addition, Buritica presented evidence at trial that Petrin had failed to train the inspectors properly. Especially when coupled

with his inaction during Buritica's detention, this evidence also supports the award of punitive damages. The court declines the opportunity to tamper with the jury's verdict and will therefore deny Petrin's motion for a judgment as a matter of law.

## III

■ Both the federal defendants and the government have moved for judgments as a matter of law on Buritica's claims for injunctive relief. These defendants claim that Buritica lacks standing to seek such relief. This is not the first time that the federal defendants and the government have raised this argument. Prior to trial, they made a motion for summary judgment on similar grounds. In response to that motion, the court noted that Buritica did indeed appear to lack standing. See Dec 22 Ord at 19. The court declined to rule, however, stating that it would reserve judgment until after trial because it was "conceivable that a full presentation of the facts [would] bring the case at bar within" a specific exception to the general standing principles governing claims for injunctive relief. Id at 20; see also *La-Duke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir.1985) (setting forth the exception).

### A

■ The government and the federal defendants have once again made a strong case that Buritica lacks standing to seek injunctive relief. The Supreme Court has established a stringent test to determine if a plaintiff has such standing. To establish that he is entitled to injunctive relief, a plaintiff must show (1) a pervasive pattern of past misconduct; (2) a causal linkage between the pattern and a policy of the named defendants; (3) the likelihood of immediate and irreparable harm; and (4) the inadequacy or unavailability of remedies at law. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

As the court noted in its December 22 order, Buritica faces a high hurdle with regard to her claim for injunctive relief. That hurdle is the requirement that she demonstrate a likelihood of immediate and irreparable harm. In *Lyons*, for example, the plaintiff sought an injunction enjoining Los Angeles police officers from using an appar-

ently dangerous form of choke hold. Although police officers had used this form of choke hold on the plaintiff himself, the court ruled that this incident alone was not enough to establish the likelihood that the police would use the choke hold on him again. See *id.* at 105, 103 S.Ct. 1660.

Despite the Supreme Court's apparently clear pronouncement, the Ninth Circuit has since ruled that plaintiffs seeking injunctive relief may not need to satisfy the four-part *Lyons* test to establish standing. See *Nava v. City of Dublin*, 121 F.3d 453, 456–57 (9th Cir.1997). The *Nava* court held that "the law of this circuit is that once a plaintiff establishes standing to seek damages, a court need not undertake a separate standing inquiry for equitable relief so long as the damages and equitable claims are predicated on the same operative facts and legal theories." *Id.* at 456. There is clearly tension between *Lyons* and *Nava*. Fortunately, the court need not enter this thicket with regard to Buritica's claim for injunctive relief because it can resolve the matter on alternative grounds.

### B

When it issued the December 22 order, the court was doubtful that Buritica would be able to demonstrate a likelihood of immediate and irreparable harm. Although *Nava* makes it unclear whether Buritica had to make such showing to establish standing to *pursue* injunctive relief, it is clear that she had to make such a showing to *obtain* injunctive relief. See *id.* at 458–59.

During trial, Buritica herself testified that she had no current plans to travel through SFO. See Buritica Tran at 47. Furthermore, Buritica is a resident of Port Chester, New York. As such, even if she does decide to travel internationally in the future, it seems unlikely that her plans would again take her through SFO. The court therefore finds that Buritica has not established a likelihood of immediate and irreparable harm. She cannot obtain injunctive relief, and thus her claim is effectively moot. The court will therefore grant the motion by the government and the federal defendants with regard to Buritica's claims for injunctive relief.

The court notes that it has previously reserved judgment on the non-federal defendants' motions for summary judgment with regard to Buritica's claims for injunctive relief. Because the likelihood that these defendants will irreparably harm Buritica in the immediate future is obviously tied to the likelihood that the government will do so, it seems clear that Buritica's claims for injunctive relief against the non-federal defendants must also fail. Nonetheless, the court is wary of the fact that this issue (with regard to the non-federal defendants) is not properly before the court at this time. The court will therefore await renewed motions for summary judgment from the non-federal defendants before ruling on this matter.

### IV

Also pending before the court is Buritica's claim for declaratory relief against the government. Specifically, Buritica is seeking a declaration that several of the Customs policies that were in effect when the inspectors detained her and that are still in effect today are unconstitutional. Buritica tried this claim to the court. In addition to considering the evidence presented at trial, the court requested information regarding any programs that Customs is operating to provide incentives to inspectors who interdict drug smugglers. Both Buritica and the government filed timely responses to this request.

### A

■ The court notes, as it has before, that the decision to grant declaratory relief (at least against the government) rests in the sound discretion of the trial court and is to be exercised in the public interest. See Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2759 (1983); see also Dec 22, 1997, Ord at 18. The court has grave concerns about the constitutionality of at least one Customs policy applied in this case. Because this policy is still in effect, review of this policy may serve the public interest.

At the time of Buritica's detention, the United States Customs Service had a policy under which inspectors could receive cash rewards or other incentives for interdicting drug smugglers. Customs currently has a similar policy in effect. See Rigdon Decl at

¶ 10. Under this policy, inspectors can receive a "Superior Achievement Award" for, inter alia, narcotics seizures. When determining whether to give an inspector this reward, Customs considers (1) the amount of drugs seized, (2) whether seizure led to further law enforcement activity and (3) whether the smuggler was employing an unusual concealment method. See id, Ex E at 2.

Inspectors Vigna and Petrin were both aware of the incentive program at the time of Buritica's detention. At trial, they both testified that Customs inspectors at SFO can receive cash incentive awards if they successfully interdict drug smugglers. See Petrin Tr at 61, 11–14; Vigna Tr at 6, 13–16. At trial, Inspector Quiroz denied any such knowledge of the awards program. See also Quiroz Depo at 208, 19–22. In her deposition, however, Buritica explained that Quiroz discussed the incentive program in detail and with excitement while Buritica was detained. See Buritica Depo at 321–323.

Whether the cash incentive program actually motivated the actions of the Customs inspectors in this case is difficult to determine. Nonetheless, it appears to the court that the very existence of this program may very well run afoul of the Fourth Amendment. Specifically, such a program creates perverse law enforcement incentives that have an unduly dangerous propensity to encourage unreasonable searches and detentions.

The Supreme Court has recognized the dangers of such programs in similar (albeit not identical) situations. In *Connally v. Georgia*, 429 U.S. 245, 250–51, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977), the Court struck down a Georgia statutory scheme that paid magistrates for each search warrant they issued, but paid them nothing for each application they denied. The court held that the scheme's inherent financial temptations created a potential for the over-zealous issuance of warrants. As such, the scheme violated the Fourth Amendment rights of search subjects. See *id.* at 250, 97 S.Ct. 546.

Similarly, in *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250–52, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), the Court considered the constitutionality of a federal scheme that returned small percentages of fine revenue to the

agency that issued the fines. The Court upheld the scheme because, inter alia, "no official's salary [was] affected by the level of the penalties." *Id.* at 245, 100 S.Ct. 1610. In other words, while there may have been a slight incentive for the agency to issue fines, there were no personal incentives for the agents themselves. The Court was understandably wary of the various conflicts that would arise if the agents who issued the fines were personally entitled to a percentage of the resulting revenue.

Indeed, the problems identified in these cases are, apparent to the other branches of government as well. The political bodies that oversee law enforcement agencies are no doubt aware of the various concerns the public may have with such incentive programs. A recent and thorough review of drug-related government seizure policies revealed numerous situations in which law enforcement *agencies* had financial incentives to seize assets. Nonetheless, the review uncovered only one instance in which a law enforcement agency gave the *agents* themselves personal incentives to make such seizures. See Eric Blumenson and Eva Nilsen, *Policing for Profit: The Drug War's Hidden Economic Agenda,* 65 U Chi L Rev 35, 65 (1998); see also Brian McGrory, *With Rewards Plan, Utah Town Tries to Cut into Drug Trade,* Boston Globe, Feb 27, 1995, at A3 (detailing policy in Helper, Utah, that gave twelve percent of any drug forfeiture funds to the arresting officer). And even in that lone instance, public backlash against the proposal appears to have been understandably strong. See McGrory (discussing fears that the policy would lead to an overly aggressive or even corrupt police force).

▇ The cash incentive program in effect at Customs strikes an ominous historical chord as well. At least as far as it concerns rewards for drug interdiction,[2] the cash incentive policy bears striking resemblance to British colonial practices that helped to spark the American Revolution and led to the adoption of the Fourth Amendment. See Blumenson and Nilsen, 65 U Chi L Rev at 75–76. In colonial times, "[w]rits of assistance

authorized customs officers to seize suspected contraband and to retain a share of the proceeds." *Id.* at 75. "From the viewpoint of the Crown, this incentive helped to ensure that goods landing in American ports were taxed or, if prohibited, confiscated. But for the colonists, it was an outrage that brought with it corrupt officials [and] lawless seizures." *Id.* (noting that John Adams wrote that "public outcry against the writs of assistance was one of the sparks leading to American independence"); see also Tracey Maclin, *When the Cure for the Fourth Amendment is Worse Than the Disease,* 68 S Cal L Rev 1, 13–25 (1994) (discussing the impact of the writs of assistance on the American Revolution and the adoption of the Fourth Amendment); but see Akhil Reed Amar, *Fourth Amendment First Principles,* 107 Harv L Rev 757, 772 (1994) (downplaying the significance of the writs of assistance controversy).

The court notes that in other circumstances, the government itself has apparently recognized and heeded the centuries of concern about monetary incentives for law enforcement officials. For example, whenever federal agents make a drug related seizure, the government has authorized the use of seized money for seizure related expenses and other law enforcement activity. Nonetheless, the government may not use that money to pay the salaries of federal employees. See Blumenson and Nilsen, 65 U Chi L Rev at 50 n62 (citing 28 U.S.C. § 524(c)(1)(F)).

With regard to the cash incentive program in place at Customs, however, the government has not been so cautious. In fact, the government's basic justification for the program is that it does not impermissibly encourage unreasonable searches and detentions because it is a relatively minor program. In what could be construed as a tacit admission of the constitutional problems inherent in the program, the federal defendants contend that the cash incentives are relatively · small and thus any potential Fourth Amendment issues associated with them are de minimis. See Fed Def Mem re Prog at 4. The court doubts this argument for two reasons. First, awards of $100 to

---

**2.** The court notes that it is concerned only with the aspect of the cash incentive program that rewards Customs inspectors for seizing drugs and performing other law enforcement tasks.

Obviously, rewarding Customs employees for fixing computer systems or helping travelers is not a constitutionally suspect policy.

$400 are hardly negligible. Second, even if they were, it is unacceptable for the government to provide its officers with such incentives, no matter how small they are. The risks of over-zealous and biased law enforcement are simply too great. See, for example, *Connally,* 429 U.S. at 245, 97 S.Ct. 546 (rejecting the argument that a $5 fee for search warrants was de minimis and therefore did not create impermissible risks).

In short, the court expresses its serious concern regarding Buritica's ordeal and at least one Customs policy that may have motivated it. Nonetheless, the court will not address this issue at this time for reasons explained below.

### B

■ In addition to moving for judgments as a matter of law with regard to Buritica's claims for injunctive relief, the government and the Customs inspectors have moved for judgments as a matter of law with regard to Buritica's claims for declaratory relief. In essence, the government and the Customs inspectors contend that Buritica lacks standing to bring these claims and that her claims are effectively moot because the evidence at trial did not demonstrate a probability that she will travel through and be detained at SFO in the future.

In the December 22, 1997, order, the court reserved judgment on the government's motion for summary judgment with regard to Buritica's claims for declaratory relief. The court noted that Buritica would only have standing to seek declaratory relief if she had presented a "substantial controversy between two parties having adverse legal interests that is sufficiently real and immediate to warrant the issuance of a declaratory judgment." Dec 22 Ord at 17. Concluding that "Buritica's allegations demonstrate that she may be subject to future harm," the court allowed Buritica to proceed to trial on these claims. *Id.* at 18. Much as it did in the context of the claims for injunctive relief, the court noted that it would revisit Buritica's standing once the parties had better developed the factual record.

With the trial of these claims complete, the court can no longer simply accept Buritica's allegations. The court must now apply the appropriate legal standard to the facts presented at trial and determine if Buritica indeed has standing to pursue her claims for declaratory relief. Ironically, the facts relevant to the standing inquiry are clear; what is unclear, however, is which legal standard to apply. Although the court was able to avoid a related thicket when it addressed Buritica's claims for injunctive relief, Buritica's claims for declaratory relief force the court to address a similarly thorny issue and choose one of two competing legal standards.

### 1

Under the first of these standards, Buritica would only have standing to seek declaratory relief if she established a "credible threat" of future injury. In *Ashcroft v. Mattis,* 431 U.S. 171, 171–72, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), the plaintiff sued state law enforcement officials after police officers shot and killed his 18 year-old son. With his claim for damages resolved, the plaintiff also sought a declaration that certain state statutes authorizing police officers to use lethal force were unconstitutional. The plaintiff argued that he had standing to pursue this claim because he had another son who may face the same fate at the hands of the police. See *id.* at 172, 97 S.Ct. 1739 n2. The Supreme Court rejected this argument and ruled that these threats of harm were too remote to satisfy Article III. See *id.*

Six years later, in the landmark case of *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Court again applied rigid standing requirements to a plaintiff seeking equitable remedies including declaratory relief. The plaintiff in *Lyons* sought, inter alia, a declaratory judgment stating that the use of a certain type of choke hold by the Los Angeles Police Department was unconstitutional. See *id.* at 98, 103 S.Ct. 1660. Although the police had already used this form of choke hold on the plaintiff in the past, the Court nonetheless ruled that he did not have standing to bring a claim for declaratory relief. See *id.* at 104, 103 S.Ct. 1660. Specifically, the court ruled that the plaintiff's mere "assertion that he may again be subject to an illegal choke hold does not create the actual controversy that must exist for a declaratory judgment to be entered." *Id.*

During the same term that it decided *Lyons,* the Court also noted that a plaintiff

seeking declaratory relief must establish a "credible threat" that he will suffer injury in the future as a result of the challenged law or policy. See *Kolender v. Lawson*, 461 U.S. 352, 355, 103 S.Ct. 1855, 75 L.Ed.2d 903 n3 (1983). In *Kolender*, the Court allowed the plaintiff to proceed with his challenge to an anti-loitering statute because police had stopped the plaintiff pursuant to the statute approximately fifteen times over a two year period. See *id.* The Court therefore concluded that absent judicial intervention, there was a credible threat that the police would stop the plaintiff again.

Two years later, the Ninth Circuit applied this stringent standard. See *Sample v. Johnson*, 771 F.2d 1335, 1340 (9th Cir.1985), cert den 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986) ("The Supreme Court has stated that plaintiffs must demonstrate that a 'credible threat' exists that they will again be subject to the specific injury for which they seek injunctive or declaratory relief"). Putting the standard in different words, the *Sample* court noted that "[t]here must be a 'demonstrated probability' that [the] plaintiff will again be among those injured." *Id.*; see also *Jeffrey v. St. Clair*, 933 F.Supp. 963, 971 (D.Hawaii 1996) (applying the same standard).

### 2

In the wake of *Lyons* and *Kolender*, however, courts in the Ninth Circuit began planting the seeds for what would later develop into a less stringent standing requirement. In *Gonzales v. City of Peoria*, 722 F.2d 468, 480–81 (9th Cir.1983), the Ninth Circuit applied the stringent *Lyons* test and ruled that certain plaintiffs had standing to seek declaratory relief because they had established that there was "a sufficient future threat" that the defendants would violate their constitutional rights. *Id.* at 481. In dictum, the *Gonzales* court also noted that unlike *Lyons*, the plaintiffs' claims for damages were not severable from their claims for equitable relief. See *id.*

Expanding broadly on the *Gonzales* dictum, another Ninth Circuit panel suggested that district courts should not make separate inquiries into a plaintiff's standing to pursue damages and equitable relief. See *Giles v. Ackerman*, 746 F.2d 614, 619 (9th Cir.1984). The *Giles* court concluded that plaintiffs who

have standing to seek damages ipso facto have standing to seek equitable remedies such as injunctive and declaratory relief. See id. In *Smith v. City of Fontana*, 818 F.2d 1411, 1423 (9th Cir.1987), the Ninth Circuit narrowed but nonetheless applied the less stringent standing requirements set forth in *Giles*. Most recently, the Ninth Circuit reiterated these lax standing requirements in *Nava*. See *Nava*, 121 F.3d at 456.

Despite these opaque pronouncements, however, the court is far from convinced that this suggestion of a relaxed standing requirement is correct. Indeed, several Ninth Circuit panels have apparently rejected the relaxed standard put forth in *Giles*. See *Lee v. State of Oregon*, 107 F.3d 1382, 1388–89 (9th Cir.1997) (quoting and following *Sample*); *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066 (9th Cir.1995) (plaintiff's justiciable claim for damages did not create standing for plaintiff to seek equitable relief); *Thomas v. County of Los Angeles*, 978 F.2d 504, 507–08 (9th Cir.1992) (applying the stringent *Lyons* requirements); *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1306–09 (9th Cir. 1992) (same); *Nelsen v. King County*, 895 F.2d 1248, 1249–55 (9th Cir.1990) (same); see also *Nava*, 121 F.3d at 460 (Fletcher, J, concurring). Furthermore, as the *Nava* court itself noted, no other circuits have adopted the *Giles* approach; in fact, six have rejected it. See, for example, *Robinson v. City of Chicago*, 868 F.2d 959, 967 (7th Cir. 1989) (criticizing the standard used in *Giles* and *Smith* ).

### 3

■ More than just a wealth of case law counsels against the application of the relaxed standing requirements set forth in *Giles*. The simple fact that a plaintiff is the appropriate person to seek damages for past wrongs does not mean that he is the proper person to seek prospective relief with regard to anticipated wrongs of the same nature. The case and controversy requirement embedded in Article III does more than simply limit the flow of cases into federal court; it serves important judicial interests.

First, rigid application of the federal standing requirements ensures that a plaintiff has a sufficiently personal stake in the outcome. This encourages the sort of vigorous litigation that courts depend upon to

reach informed decisions and establish sensible precedent. Allowing plaintiffs to seek prospective relief even if they do not face imminent harm would severely undermine this policy.

Second, federal standing requirements serve to prevent the judicial branch from over-stepping its boundaries and entering the domains of the executive and legislative branches. When courts grant equitable remedies against the government, they often force executive branch officials to implement or remove policies. While the courts must of course guarantee that the executive branch of government obeys the constitution, standing requirements provide a valuable check which ensures that judicial power is exercised prudently.

### 4

Having considered the clear precedent from the Supreme Court and the important judicial policy considerations underlying the federal standing requirements, on the one hand, and the conflicting Ninth Circuit precedent on the other, the court will apply the strict standing requirements set forth in *Lyons* and *Sample.* The court therefore concludes that Buritica must establish a "credible threat" that Customs agents at SFO will subject her to harm in the future.

For reasons already discussed in the context of Buritica's claims for injunctive relief, the court finds that she has not demonstrated that there is a credible threat that Customs inspectors will again detain her and violate her constitutional rights at SFO. The court will therefore grant the motion by the federal defendants and the government for judgments as a matter of law on Buritica's claims for declaratory relief. For reasons discussed above, the court will await renewed summary judgment motions from the non-federal defendants before addressing this matter as it concerns them.

### V

Buritica tried her claims for money damages against the government to the court pursuant to the Federal Tort Claims Act (FTCA). See 28 U.S.C. § 2402; see also *Carlson v. Green,* 446 U.S. 14, 22, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (holding that an FTCA plaintiff has no right to a jury). The court is still reviewing the voluminous evidence submitted by both parties with regard to this claim. As such, the court is not prepared to reach any conclusions and will therefore reserve judgment on this claim.

### VI

For the foregoing reasons, the court:

(1) DENIES the alternative motions by Quiroz and Vigna for remittitur and a new trial;

(2) DENIES the motion by Petrin for judgment as a matter of law with regard to punitive damages;

(3) GRANTS the motions by the federal defendants and the government for judgment as a matter of law with regard to Buritica's claims for injunctive and declaratory relief; and

(4) RESERVES judgment on Buritica's FTCA claims against the government for money damages.

IT IS SO ORDERED.