Wood, Chief Judge, dissenting.
Few would doubt that financial conflicts of interest can destroy the integrity of a relationship. That is why, in Tumey v. Ohio , 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the Supreme Court found that due process was violated when a local judge's salary depended on the fines that resulted from convictions in cases before him. See also Connally v. Georgia , 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (due process violated by local law providing that judge was compensated only when he issued search warrants, not when he denied them). It is why judges must give extra scrutiny to the performance of counsel in class actions, lest the lawyer sell out the class and walk away with an enormous fee. See RICHARD A. POSNER , ECONOMIC ANALYSIS OF LAW 803-04 (9th ed. 2014); Jack B. Weinstein, Ethical Dilemmas in Mass Tort Litigation , 88 NW. U. L. REV. 469, 502-03 (1994). And it is why the Rules of Professional Conduct for Attorneys in Wisconsin, which are based on the American Bar Association's Model Rules with some additions not material here, state that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." SCR 20:1.7(a). One way in which a forbidden conflict can arise is if "there is a significant risk that the representation of one or more clients will be materially limited by ... a personal interest of the lawyer." Id. at 20:1.7(a)(2). The lawyer is relieved of this responsibility only if, among other things, the "affected client gives informed consent, confirmed in a writing signed by the client." Id. at 20:1.7(b)(4). In addition, lawyers may not limit the scope of their representation of a client unless "the client gives informed consent," again in writing. Id. at 20:1.2(c).
The obvious concern is that, faced with a conflict between one's own financial interest and the interests of another person, the former will win out. If the lawyer puts his or her own interest first, the client is the loser. This is precisely what Cornell Reynolds says happened to him in the course of the criminal prosecution the State of Wisconsin brought against him in the early 2000s.
The key events in the case can be summarized quickly. In May 2001, Reynolds was charged with carjacking resulting in death. The primary issue at the trial was identification. A jury convicted him, and he was sentenced in early 2002. As Wisconsin law permits, Reynolds then filed a direct appeal and a post-conviction motion simultaneously. At that point, the Wisconsin State Public Defender's Office appointed attorney Terry Williams to serve as Reynolds's post-conviction and appellate counsel. Williams filed a motion for a new trial on the ground that Reynolds's trial counsel had been ineffective in failing to raise an alibi defense. The state trial court denied the post-conviction motion without holding an evidentiary hearing.
Still with Williams's help, Reynolds appealed to the Wisconsin Court of Appeals, which reversed and remanded the ruling on the post-conviction motion so that the trial court could hold an evidentiary hearing on the ineffectiveness point. The trial court obliged, but it again concluded that Reynolds was not entitled to a new trial.
So far, so good. The problem now before us arose when Williams filed a new appeal on Reynolds's behalf. While that appeal was pending, someone on the staff of the Wisconsin State Public Defender's Office told Williams that he had spent too much *713 time on the case. The consequences were serious for Williams: (1) he would not be paid for some of the work he already had done; (2) he would not be paid for any more work on Reynolds's case; and (3) he would no longer receive case assignments from the Public Defender. At that point, Williams halted all further work on the case. Reynolds asked him to pursue an equal protection challenge to the car-jacking statute, but Williams refused to do so. Importantly, his stated reason had nothing to do with the potential merit of such an argument. Williams frankly said that he was shutting down his work because the state was not paying him. He told Reynolds that he would do additional work if Reynolds paid him for it, but Reynolds was unable to do so. Williams simply filed the brief he already had prepared, and after the court of appeals affirmed the trial court's order, he later filed a petition for review on Reynolds's behalf in the Wisconsin Supreme Court.
After some additional state proceedings, Reynolds filed a petition for habeas corpus under 28 U.S.C. § 2254 in the federal court. He presented several arguments: first, that he was constructively denied counsel after the Public Defender's Office cut off Williams's pay, in violation of United States v. Cronic , 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ; second, that Williams had an actual financial conflict of interest, which resulted in the denial of effective assistance of counsel under the standards of Cuyler v. Sullivan , 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) ; and third, that his appellate counsel was ineffective pursuant to Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for failing to object to trial counsel's own failure to object to certain jury instructions. While I am persuaded that the state courts' decisions fell within the generous boundaries provided by section 2254 with respect to the first and third of these arguments, I conclude that the state courts, as well as the majority here, have failed to apply Cuyler properly and that Reynolds is entitled to issuance of the writ on this ground.
In Cuyler , the Supreme Court addressed the question "whether a state prisoner may obtain a federal writ of habeas corpus by showing that his retained defense counsel represented potentially conflicting interests." 446 U.S. at 337, 100 S.Ct. 1708. In the case before the Court, two lawyers had represented three co-defendants in a murder prosecution. The Court accepted that this amounted to multiple representation. Id. at 342, 100 S.Ct. 1708. But it clarified that "multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest." Id. at 348, 100 S.Ct. 1708.
The burden on a defendant who seeks to establish a violation of the Sixth Amendment in such cases, the Court held, is to "demonstrate that an actual conflict of interest adversely affected his lawyer's performance ." Id. (emphasis added). Such a showing might rest on a failure to cross-examine a witness, or a failure to object to the introduction of certain evidence. Id. at 348-49, 100 S.Ct. 1708. Critically, it is the lawyer's performance that is the focus of the inquiry, not the ultimate outcome of the trial. The Court expressly declared that once unconstitutional multiple representation has been demonstrated-that is, once the defendant has shown an actual conflict and an adverse effect on the lawyer's performance-there "is never harmless error." Id. at 349, 100 S.Ct. 1708 (emphasis added). Underscoring that fact, the Court continued as follows:
Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.
Id. at 349-50, 100 S.Ct. 1708. Because the court of appeals had used a different standard, *714 the Court remanded the case for further proceedings.
As my colleagues note, some conflicts and ethical violations do not present difficulties akin to multiple representation. Ante at 709-10. But we must not lose sight of the fact that Cuyler created a standard to be applied not just when one attorney represents clients with competing interests, but "in situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." Mickens v. Taylor , 535 U.S. 162, 176, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). The existence of an actual conflict of interest between attorney and client is one of those instances. Cf. United States v. Gonzalez-Lopez , 548 U.S. 140, 146, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (finding structural error in the deprivation of the right to counsel of choice, rejecting harmless error, and holding that "no additional showing of prejudice is required to make the violation 'complete' ").
Reynolds has established the two elements required by Cuyler : he has shown that there was an actual conflict of interest between him and his lawyer, and he has shown that the conflict had an adverse effect on his lawyer's performance, insofar as the lawyer limited the scope of his representation to the matters he already had researched and flatly refused to look into anything else. The Supreme Court has not distinguished between an actual conflict of interest arising out of multiple representation, as was present in Cuyler , and a more direct conflict of interest between attorney and client based on financial considerations. (Indeed, the latter situation involves a form of multiple representation: Williams was trying to represent both himself and Reynolds.) Nor can there be any doubt that the conflict between Reynolds and Williams affected Williams's performance. Without obtaining Reynolds's permission, as contemplated by professional ethics norms and over Reynolds's direct objection, Williams froze his work for Reynolds and did nothing but file what he already had completed, following up on the same limited points with the state supreme court.
At the state post-conviction stage, Reynolds presented this conflict-of-interest claim to the state courts. The Wisconsin court of appeals agreed that "a conflict of interest may also arise when an attorney and his client have divergent interests." Sep. App. at 70 (quotation marks omitted). The court then correctly noted that the claimant had to show an actual conflict and an adverse effect on the lawyer's performance. Id. It then discussed Williams's performance for a bit, but it pivoted over to the ultimate result in the case, when it said that had Williams not had the conflict, he would have determined that the issue Reynolds wanted to raise was not properly before the court in any event. That is the language of harmless error, not a reference to Williams's own performance. It says, in essence, that the conflict affected Williams's performance insofar as he failed to raise the issues that Reynolds wanted to see explored, but that Williams's failure could not have affected the outcome.
That reasoning is contrary to the holding of Cuyler , which cannot have been more clear in rejecting a harmless-error approach. At the very least, it is an unreasonable application of Cuyler , since it shifts from a focus on Williams's performance to one on the ultimate impact of Williams's decisions in a manner that Cuyler forbids. See also Mickens , 535 U.S. at 170, 122 S.Ct. 1237 (2002) (stressing that the conflict must affect counsel's performance, rather than be merely a theoretical division of loyalties). Tempting as it may be to engage in harmless-error analysis in every case, the Supreme Court has decided that there are some situations in which it is off the table.
*715 The only remaining question is what the appropriate remedy is in this case. A common remedy for a failure of counsel at the appellate stage would be, as my colleagues have noted, a fresh appeal with unconflicted counsel. See Shaw v. Wilson , 721 F.3d 908, 919 (7th Cir. 2013). But nothing in the statute restricts the district court's options to only that remedy. To the contrary, the law provides that "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243, ¶ 8. The Supreme Court has recognized that "a court has broad discretion in conditioning a judgment granting habeas relief." Hilton v. Braunskill , 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The question here is thus what remedy would suffice to redress the serious miscarriage of justice suffered by Reynolds.
In my view, this is a situation that demands more than a fresh appeal. The state courts have already decided-in the absence of a proper adversary presentation on Reynolds's behalf-that any additional points that may have been raised on appeal were forfeited or meritless. I have no reason to believe that they would not simply reiterate that point, if we were to limit the remedy to a new appeal. (Principles of law-of-the-case might even require them to do so.) Because a new appeal would not redress the constitutional violation in Reynolds's case, I would issue a conditional writ granting him a new trial (if the state chooses to take that step). This is well within the scope of the statute, as our sister circuits have recognized. See, e.g., Ramchair v. Conway , 601 F.3d 66, 78 (2d Cir. 2010) (petitioner deprived of effective appellate counsel entitled to new trial as remedy); Turner v. Bagley , 401 F.3d 718, 727 (6th Cir. 2005) (granting unconditional writ requiring new trial for deprivation of access to appellate process because of undue delay); Eagle v. Linahan , 279 F.3d 926, 943-44 (11th Cir. 2001) (appellate counsel's failure to raise Batson claim remedied by grant of new trial).
In this respect, I agree with the observations of the Tenth Circuit in Clayton v. Jones , 700 F.3d 435 (10th Cir. 2012), a case in which the defendant was denied his right to appeal because of ineffective assistance of counsel. As that opinion put it, "[c]ertainly a district court is not confined to only granting an appeal out of time when a petitioner has been denied his right to a direct appeal. It is not unprecedented for a district court to fashion a remedy for ineffective assistance of counsel on appeal that goes beyond an appeal out of time." Id. at 443-44. The only problem in Clayton was that the district court had not sufficiently explained why a new appeal would not suffice. I have indicated why I believe this case is a proper candidate for a broader remedy. Reynolds has tried hard to navigate the habeas corpus process-no mean feat for even an experienced lawyer-and in my view he has shown that he should receive a new trial.
I therefore respectfully dissent.