Argued and submitted March 18, affirmed May 25,
petition for review allowed October 6, 2011 (351 Or 216)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ALEXANDER DANIEL KLEIN,
aka Alezander Daniel Klein,
*Defendant-Apppellant.*

Multnomah County Circuit Court
070331145; A139381

258 P3d 528

Andy Simrin argued the cause for appellant. With him on the brief was Andy Simrin PC.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Nakamoto, Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant appeals his convictions for murder, conspiracy to commit murder, and two counts of attempted aggravated murder. He argues, first, that body-wire and wiretap evidence admitted at his trial should have been suppressed; second, that an accomplice's testimony was insufficiently corroborated and, therefore, the trial court erred in failing to grant his motion for a judgment of acquittal on each of the charges; and third, that the court erred in excluding testimony that the accomplice had admitted to another person that she had "made this whole thing up to get out of jail." As explained below, we conclude that defendant was not an "aggrieved person" under the statutes governing the interception of oral communications and, thus, the trial court did not err in rejecting his challenge to that evidence. Concerning the accomplice testimony, we agree with the trial court's determination that the state presented sufficient corroborative evidence. Finally, as to the exclusion of the testimony concerning the accomplice's out-of-court statement, we conclude that, although such evidence may be admissible under the evidentiary rule in question, any error in excluding it in this case was not prejudicial. Accordingly, we affirm.

Because defendant was convicted after a jury trial, we state the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008). We begin with a brief overview before describing the evidence in more detail. Defendant is a member of the Rollin 60s set, and the murder victim, Asia Bell, was an associate of the Hoover set; both sets originated from within the Crips gang, but later became rivals. As explained below, this case arose out of a dispute between the two sets following a dog-fight in which a dog belonging to one of the Hoovers apparently was poisoned by members of the Rollin 60s. The Hoovers retaliated by shooting and killing a member of the Rollin 60s—defendant's half-brother Bingo Gonzales—after which defendant and other members of the Rollin 60s, including Deprince Hale, went to Bell's house where Hale shot and killed Bell. Hale also shot and wounded Bell's husband and a neighbor. The crimes occurred in 2002 but, due to a lack of leads, the investigation went "cold" until

2006. In October 2006, defendant's ex-girlfriend, Sonja Hutchens, contacted the prosecutor's office and revealed certain information about the crimes—in particular, she identified Hale as the shooter—in order to obtain release from a 10-month jail sentence that she was serving. Based on the information that Hutchens supplied, police obtained an order to intercept communications between Hutchens and Hale via a body-wire to be worn by Hutchens. ORS 133.726.

On November 3, 2006, several days before the first intercept order was scheduled to expire, the police applied for a new order to intercept communications between Hutchens and Hale under ORS 133.726. The application described telephone contacts between Hutchens and Hale, and it indicated that the two had agreed to speak again in the future. The application stated that Hutchens had failed a lie detector test, after which she had revealed that defendant had driven her car to the murder scene, and that Hale and three other named gang members had been passengers in that car. The application for the second order again only sought to intercept communications between Hutchens and Hale. That application was approved by Judge Bergstrom.[1] Based on the second order, police intercepted a communication between Hutchens and Hale in which Hale indicated that he had lost respect for defendant and another Rollin 60s gang member. In context, it was apparent that Hale's comment referred to the events that surrounded and preceded the shooting of Bell.

A third application to intercept communications under ORS 133.726 was approved in December 2006, again authorizing the interception of communications between Hutchens and Hale. As a result of information obtained pursuant to that order, as well as other information gathered by the police, a fourth order was sought (and granted) for wiretapping pursuant to ORS 133.724. The fourth order, unlike

---

[1] The only order in this series that was signed by Judge Bergstrom was the second order. Judge Bergstrom's identity is pertinent to one of defendant's suppression arguments because, at the time of the murder, Bergstrom was an assistant district attorney and, in that capacity, he was called to the scene of the Asia Bell murder and subsequently attended her autopsy. Because no suspects were developed at that time, the district attorney's office did not open a file until long after Bergstrom had left that office.

the previous three, authorized interception of communications of defendant, as well as other people. That order also produced a significant amount of evidence that was admitted at trial.

The state charged defendant and Hale with the murder of Asia Bell and related crimes. As amplified below, the state's case was constructed on the evidence obtained through the interceptions of communications described above, as well as the testimony of Hutchens. The evidence at trial showed that defendant is a member of the Gonzales family, many of whom are members of the Rollin 60s. Rico and Bingo Gonzales were defendant's half-brothers. The victim, Asia Bell, was the daughter of Steve Bell; the Bells, as well as Asia Bell's husband Tyrone James, were associated with the Hoovers. In late October 2002, Steve Bell, who owned a fighting dog named Loco, met with defendant, who owned a fighting dog named Trouble. The meeting occurred at Asia Bell's house, and various members of both sets were present. A dogfight was arranged, and a significant amount of money was placed in bets. During the fight, Loco, who previously had been undefeated, developed difficulty breathing and stopped fighting. Shortly thereafter, Loco died. Members of the Hoovers believed that members of the Rollin 60s had rubbed poison on Trouble's fur before the fight so that Loco would ingest the poison.

Several weeks after Loco's death, Rico and Bingo Gonzales, together with Hale, were present at or outside of an after-hours club when a car approached. Several people got out, including a member of the Hoovers. Almost immediately thereafter, Bingo Gonzales was shot. There was evidence that someone from the after-hours club returned fire at the shooter. Rico Gonzales and Hale took Bingo Gonzales to the hospital, where he was pronounced dead. Hoover members came to the hospital shortly thereafter and learned that Bingo was dead.

Three days later, on the evening before Bingo Gonzales' funeral, the crimes at issue in this case occurred. Defendant, Hale, and Hutchens, among others, gathered at the house of a Gonzales family member that evening. The people at the house were upset about the killing, and a group

left the house and went to a park. While at the park, the group (which included defendant, Hale, and Hutchens) plotted to take revenge against the Hoovers. Defendant, Hale, and three other members of the Rollin 60s (Rico Gonzales, Jerrin Hickman, and L'Don Archie) left in Hutchens' car, a gold Mercury Sable; defendant was driving. Hutchens followed in a different vehicle to act as a lookout.

Around 10:00 p.m., Asia Bell, her husband Tyrone James, and a neighbor, Robert Milhouse, were on Bell's porch. Defendant drove up in Hutchens' car, and Hale got out and approached the porch, shooting Bell, James, and Milhouse. Hutchens witnessed the shootings. Hale returned to Hutchens' car, and defendant drove away. Hutchens left the scene in the lookout vehicle. After leaving the scene, Hutchens went to the apartment of a friend, Angela Reeves, where Hale and defendant soon joined her. Hale asked Hutchens to wash his coat in order to remove gunpowder residue from the sleeve. Hutchens obtained permission from Reeves to use her washing machine, and then washed the coat.

Shell casings found at the scene of the crimes were positively identified as having come from the same gun that had returned fire at the shooters at the scene of the Bingo Gonzales murder. Although neighbors were able to provide police with general descriptions of the shooter, the getaway driver, and the car, the police had no solid leads as to who had shot Bell, James, and Milhouse. Thus, no prosecution was pursued until Hutchens came forward and identified Hale as the shooter.

Hutchens' testimony was a centerpiece of the state's case. At trial, Hutchens testified that she had conditionally pleaded guilty to conspiracy to commit the murder and that, if she fulfilled her obligations under her plea agreement with the prosecutor, she would be permitted to withdraw that plea and, instead, plead guilty to the less serious offense of conspiracy to commit first-degree assault. In the course of direct and cross-examination, Hutchens admitted that she had lied in numerous respects when she first talked to the police: She acknowledged that she had minimized her role in the crimes

by not revealing that she had acted as a lookout, by not disclosing that her car was used, instead describing a different car, by indicating that Reeves also had been present, and by inaccurately describing the clothes that Hale wore during the shooting. Hutchens testified that she initially had lied to the police about details of the crimes because she was only interested in being released from jail, and she did not want anyone actually to be prosecuted as a result of her disclosures.

As noted, defendant's arguments on appeal focus on Hutchens' cooperation with the police and her testimony at trial. Defendant first argues that the trial court erred in denying his motions to suppress the body-wire evidence described above, as well as the evidence derived from the subsequent wiretapping. Within those challenges, defendant makes several subarguments. For present purposes, we need not describe defendant's subarguments in detail, other than to observe that they are all based on the asserted unlawfulness of the second body-wire order. The state responds to the substance of defendant's arguments, but it also argues that defendant was not an "aggrieved person" entitled to challenge the second body-wire order because he was not a party to the intercepted conversation or a person against whom the order was directed. As explained below, we agree with the state that, with respect to the second body-wire order, defendant was not an "aggrieved person" as that term is used in ORS 133.735.[2] Consequently, we do not reach defendant's arguments on the merits of the trial court's denial of his motion to suppress that evidence.

ORS 133.735 provides in pertinent part that an "aggrieved person" may seek suppression of intercepted communications, and ORS 133.721(1) specifically defines "aggrieved person" for purposes of that statute:

" 'Aggrieved person' means a person who was a party to any wire, electronic or oral communication intercepted under ORS 133.724 or 133.726 or a person against whom

_____

[2] Defendant would qualify as an "aggrieved person" with respect to the fourth order in the series, but he does not challenge the lawfulness of that order, other than to suggest that the evidence obtained as a result of that order must be suppressed as derivative of the second order.

the interception was directed and who alleges that the interception was unlawful."

Regarding the three body-wire interception orders, defendant was not "a party" to any of the intercepted communications. As noted above, those orders authorized the interception of—and in fact did intercept—communications between Hutchens and Hale. In particular, the orders provided as follows:

"The persons whose oral communications are to be recorded are SONJA ELAINE HUTCHENS and DEPRINCE ROMEY HALE and other unknown subjects who may be present during contacts by SONJA ELAINE HUTCHENS with DEPRINCE ROMEY HALE. This order authorizes only the interception of oral communications to which SONJA ELAINE HUTCHENS is a party, which means oral communication that are made in the immediate presence of DEPRINCE ROMEY HALE and are audible to DEPRINCE ROMEY HALE."

Defendant argues that, even though the orders neither authorized the interception of, nor intercepted, any communication to which he was a party, he nonetheless was "a person against whom the interception was directed" for purposes of ORS 133.721(1). As we understand it, defendant contends that, because he could have been (but was not) an "unknown subject who may be present" during any authorized interception, he therefore was a "person against whom the interception was directed" for purposes of ORS 133.721(1). We disagree.

The meaning of "aggrieved person" in ORS 133.721(1) is unambiguous. It refers to two categories of persons—those who were a party to a communication that was intercepted, and those against whom the interception was directed. The latter term logically refers to a person who was identified in the order as a person whose oral communications could be intercepted pursuant to the order. If defendant were correct that a person "against whom the interception was directed" was meant to include *any* person who could have been (but was not) present when a communication was intercepted, the phrase would be rendered meaningless, because it would make every person an "aggrieved person."

Defendant nevertheless remonstrates that, because Oregon's statutes governing the interception of oral communications were based on federal counterparts, we should look to persuasive authority from federal courts and conclude (1) that he would have been aggrieved under federal law and, (2) perforce, that he is aggrieved under the Oregon statutory counterpart. As explained below, we disagree with the premise that defendant would have been "aggrieved" under the federal counterpart to ORS 133.721(1).

Oregon's statutes were enacted "to bring Oregon's wiretap provisions in line with the federal standards in Title III of the 1968 Omnibus Crime Control Act[.]" *State v. Pottle*, 296 Or 274, 282, 677 P2d 1 (1984). Moreover, as defendant notes, the federal definition of "aggrieved person" is substantially similar to Oregon's definition: " '[A]ggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 USC § 2510(11). In *Alderman v. United States*, 394 US 165, 173 n 6, 89 S Ct 961, 176-79, 22 L Ed 2d 176 (1969), the Court held that Congress intended "aggrieved" status under the federal statute to coincide with standing for purposes of the Fourth Amendment, and to confine standing to assert violations of the federal statute to persons whose conversations were intercepted and persons with a privacy interest in the location where the conversation took place. Defendant does not argue that he meets the criteria set out in *Alderman*, but he asserts that a later case from the Fourth Circuit, citing *Alderman*, applies here.

In that case, *US v. Gibson*, 500 F2d 854 (4th Cir 1974), *cert den*, 419 US 1106 (1975), the court indicated in a one-page opinion that the appellant, who had challenged a properly authorized intercept order on the ground that it was based, in part, on information obtained pursuant to an earlier, improperly authorized order, was not "aggrieved" because he "was not implicated in any way by information obtained by the [earlier] taps. Informed of it at the time, he would clearly have had no standing to suppress information which contained no allusion to him or to his conduct." *Id.* at 855. Defendant reasons that *Gibson* also stands for the reverse proposition: that, if there *had* been "allusion[s] to [the

defendant] or to his conduct" during the earlier intercepted conversation, he necessarily would have been an "aggrieved person" for purposes of both the earlier and the *later* interceptions. Such a reading of *Gibson*, however, would be contrary to *Alderman*, contrary to the text of the federal statute, and inconsistent with other federal case law that is directly on point. *See, e.g.*, *United States v. Williams*, 580 F2d 578, 583 (DC Cir), *cert den*, 439 US 832 (1978) (an accused may only seek suppression where electronic eavesdropping was directed at him, the Government intercepted his conversations, or the wiretapped communications occurred at least partly on his premises); *United States v. King*, 478 F2d 494, 506 (9th Cir), *cert den*, 414 US 846 (1973) (a defendant may move to suppress "only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premise"). Thus, we will not ascribe to *Gibson* the significance that defendant propounds.

In sum, defendant asserts an illegality with respect to the second interception order. However, he was not an "aggrieved person" with respect to any communication intercepted pursuant to that order, because he was not a party to any such intercepted communication, he was not a person against whom such an interception was directed, ORS 133.721(1), nor did he have any asserted privacy interest in the location where any such intercepted communication took place. *Alderman*, 394 US at 176. Thus, the trial court properly admitted the evidence obtained pursuant to the orders against defendant at trial.

Defendant next argues that the trial court erred in denying his motion for a judgment of acquittal on each of the charges on the ground that the state's case was exclusively based on uncorroborated evidence supplied by an accomplice, Hutchens. ORS 136.440(1) provides:

"A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

Corroborating evidence may be circumstantial, and there need not be independent corroborating evidence with respect to every material element of the crime. *State v. Walton*, 311 Or 223, 243, 809 P2d 81 (1991).

Defendant notes that accomplice testimony cannot be used to bolster other accomplice testimony, and thus reasons that his own statements, and Hale's statements obtained via the various recordings described above, cannot be used to corroborate Hutchens' testimony. Moreover, defendant asserts, the only remaining evidence tending to connect him with the charged offenses was the testimony of Reeves, who confirmed Hutchens' testimony about washing Hale's coat. As explained below, we disagree on both points; Hutchens' testimony could be corroborated by evidence of Hale's and defendant's *statements*, which were not *testimony* and thus not subject to ORS 136.440, and in any event, other corroborative evidence was adduced in addition to Reeves' testimony about the coat.

First, we review the corroborative evidence apart from defendant's and Hale's statements. Hutchens and defendant were together, and had been in her car, shortly before the instant crimes were committed. Defendant was known to regularly drive Hutchens' car. Three people in the area of the shooting described a car that closely matched the description of Hutchens' car (which, according to Hutchens, had been used in the crimes), including various details relating to the color, wheels, window tint, and make of the car. One of the witnesses identified Hutchens' car as the "exact same" car; another described it as "very, very close" to what he recalled seeing; the third witness said it was "probable" that it was the same type of car that she saw. Other witnesses also confirmed that the shooter was wearing a black coat and that he got into the back seat of the car after the shooting. The witness who described Hutchens' car as "the exact same car" also heard the gunshots and saw someone who generally matched Hale's description get into the car, which was being driven by someone who generally matched defendant's description. And, as defendant acknowledges, Reeves' testimony confirmed that defendant and Hale sought to wash the black coat almost immediately after the crimes

were committed. Moreover, as the state notes, there was ample evidence apart from Hutchens' testimony about the dogfight and the murder of Bingo Gonzales, all of which confirmed Hutchens' rendering of the motive for the crimes. All of that evidence, considered together, was sufficient to corroborate Hutchens' testimony concerning defendant's participation in the crimes.

Although we conclude that the above-described evidence sufficiently corroborated Hutchens' testimony, we also address defendant's argument that neither his nor Hale's out-of-court statements could be used to corroborate Hutchens' testimony. First, we note that, in general, those statements did not explicitly acknowledge either defendant's or Hale's participation in the crimes; rather, they tended to show that defendant and Hale were trying to prevent Hutchens from discussing her knowledge of the crimes with the police. Viewed in that light, defendant appears to make two arguments: First, he suggests that, because he and Hale were "jointly alleged as the perpetrators," both "must be considered to be accomplices to each other as well" and, thus, their statements cannot be used for corroboration. To the extent that that argument is based on ORS 136.440, it is misplaced because that statute pertains to the "testimony" of an accomplice. Neither Hale nor defendant testified at trial in this case. For purposes of ORS 136.440, out-of-court statements by other participants in a crime, including the defendants, can be used to corroborate the testimony of an accomplice. *See, e.g., State v. Boone*, 213 Or App 242, 249, 160 P3d 994, *modified on recons*, 215 Or App 428, 169 P3d 1274 (2007) (defendant's admissions corroborated accomplice's testimony); *State v. Norton*, 157 Or App 606, 610, 972 P2d 1198 (1998) (same).[3]

Second, defendant suggests that his own recorded statements that might otherwise be deemed to corroborate Hutchens' testimony constituted confessions that themselves

---

[3] Of course, other sources of law, such as the Confrontation Clause, might prohibit the use of out-of-court statements by nontestifying accomplices at trial in some circumstances. Defendant raises no confrontation argument here.

required corroboration. ORS 136.425. That argument requires only a brief response. First, insofar as we are aware, defendant did not rely on ORS 136.425 at trial, nor does he assert on appeal that his alleged "confession" was erroneously admitted into evidence in violation of that statute. Second, in any event, nothing in defendant's recorded statements presented at trial even remotely resembles a "confession" as that term was described by the court in *State v. Manzella*, 306 Or 303, 316, 759 P2d 1078 (1988). We therefore conclude that the trial court properly denied defendant's motion for a judgment of acquittal.

In his remaining assignment of error, defendant contends that the trial court erred in excluding the proffered testimony of Alisha Banks, who would have stated that, while the two women were in jail, Hutchens told her that "I made this all up, so I could stay out of jail." Defendant contends that Banks' testimony should have been admitted as impeachment evidence. At trial, the state argued that, because Hutchens had acknowledged in her own testimony that she had made such a statement at the jail, there was no need for the evidence. The state further argued that defendant had not laid a sufficient foundation for the evidence. The trial court concluded that extrinsic evidence of Hutchens' statement was not admissible because she had, in fact, acknowledged making that statement.[4] Defendant asserts that the court erred in so ruling.

OEC 613(2), which concerns prior statements by witnesses, provides, in part:

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

To the extent that the trial court may have concluded that evidence of prior inconsistent statements is *per se*

---

[4] The court also indicated that an insufficient foundation was laid, at least as to some of the evidence being discussed. In context, it would appear that the court's statement about lack of foundation applied to a witness other than Banks, whose proffered testimony is not at issue on appeal.

inadmissible under OEC 613(2) if the witness has acknowledged making the prior inconsistent statement, we agree with defendant that OEC 613(2) contains no such absolute prohibition.[5] That is not to say, however, that any reversible error occurred here.

The proffered evidence was logically relevant for impeachment purposes; it would have demonstrated that Hutchens told someone before trial that she "made this all up," presumably referring to the version of events that she intended to testify to at trial. Although *relevant*, the proffered evidence was not particularly significant where, as here, the person who made the statement fully acknowledged having done so, and her motives for doing so were fully explored during her own testimony. As such, the evidence would have been cumulative, and a court has discretion to exclude evidence that is merely cumulative. *See generally* OEC 403.

Defendant notes—and we agree—that the trial court did not exclude the evidence on the ground that it was cumulative. However, evidentiary error is not presumed to be prejudicial. OEC 103(1). Notwithstanding the erroneous exclusion of evidence at trial, we will affirm a conviction if there is little likelihood that the exclusion affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Because we must assess the likelihood that the exclusion of the proffered evidence affected the verdict, we are obliged to consider the cumulative nature of the evidence. Defendant asserts, citing *Davis*, that "similar evidence that is different in nature is not merely cumulative." However, defendant does not explain how Banks' testimony is "different in nature" from the statement that Hutchens had testified about.

In *Davis*, the primary issue at trial was whether the defendant had shot the victim or she had shot herself while the defendant was trying to end their relationship. The trial court erroneously had excluded evidence that the murder victim had a long history of threatening suicide in the context of her relationship with the defendant because it was "too

---

[5] We note, by contrast, that OEC 609-1(2), which relates to impeachment of a witness for bias or interest, does prohibit extrinsic evidence of statements demonstrating the alleged bias or interest if the witness fully admits such bias or interest.

remote to be relevant and would unduly prejudice a jury." *Id.* at 23. In considering whether the error was harmless, the Supreme Court rejected the state's argument that the evidence was merely cumulative. The excluded evidence would have shown that, over the course of several years, the victim had made statements indicating that she would kill herself if she could not continue her relationship with the defendant. *Id.* at 23-25. The state pointed out that evidence had been admitted that the victim had stated, after the death of her child, that she didn't think she could go on without the defendant, and that the victim had been treated for depression. *Id.* at 33-34. The court noted, however, that the admitted evidence did not expressly indicate that the victim had threatened to kill herself because of her relationship with the defendant and that the excluded evidence "tended to show that the victim's depression and suicidal obsession were long-term and connected to her turbulent relationship with defendant." *Id.* at 34. In sum, the court in *Davis* concluded that the excluded evidence would have demonstrated significantly *more* than the admitted evidence did.

Here, by contrast, the excluded evidence would have demonstrated exactly the same thing as the admitted evidence, namely, that Hutchens had made a particular statement while in jail. We conclude that the proffered evidence was not "different in nature" from the evidence that was admitted and, thus, its exclusion was unlikely to have affected the verdict. *Id.* at 32.

To summarize: the trial court properly denied defendant's motion to suppress because, with respect to the order that he challenges, defendant was not an "aggrieved person" for purposes of the statutes governing the interception of oral communications. In addition, the trial court properly denied defendant's motion for a judgment of acquittal, because Hutchens' accomplice testimony was adequately corroborated. Finally, to the extent that the trial court erroneously concluded that Banks' testimony was *per se* inadmissible under OEC 613(2), given the cumulative nature of the proffered evidence any error was unlikely to have affected the verdict.

Affirmed.