Argued and submitted December 21, 2011, affirmed September 6, 2012, petition for review denied April 25, 2013 (353 Or 533)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DEPRINCE ROMEY HALE,
aka Deprince Hale,
*Defendant-Appellant.*

Multnomah County Circuit Court
070331144; A139382

288 P3d 1

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services. Deprince Romey Hale filed the supplemental brief *pro se*.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant and his codefendant, Klein, were charged with murdering Asia Bell and attempting to murder Tyrone James and Robert Milhouse in a gang-related shooting at the Bell residence ("the Bell shooting"). The Bell shooting occurred in 2002, but the criminal investigation went cold until Klein's former girlfriend, Hutchens, contacted the prosecutor's office in 2006. Based on information that Hutchens supplied, police obtained orders allowing them to intercept communications between defendant and Hutchens by way of a body wire worn by Hutchens. And, based on evidence obtained via the body wire and further investigation, the police obtained a wiretapping order that yielded additional evidence regarding the shooting. Both Klein and defendant sought to suppress evidence obtained by way of those intercept orders, on the ground that the orders—particularly, the second body-wire order—were obtained illegally. The trial court denied the motions, and Klein and defendant were convicted of murder, conspiracy to commit murder, and attempted aggravated murder.

Klein's appeal reached this court first. He argued, as he did below, that the body-wire and wiretapping evidence should have been suppressed because the underlying communications were unlawfully intercepted. *See* ORS 133.735(1) ("[a]ny aggrieved person in any trial, hearing or proceeding in or before any court * * * may move to suppress the contents of any wire, electronic or oral communication intercepted under ORS 133.724, or evidence derived therefrom" on the ground that the "communication was unlawfully intercepted"); ORS 133.736(1) (similarly providing that any "aggrieved person" may move to suppress unlawfully intercepted body-wire evidence). We affirmed without reaching the merits of Klein's suppression argument, however, because the intercept order that he challenged—the second body-wire order—was directed at communications between Hutchens and *defendant*, not Klein. Thus, Klein was not a party to the intercepted communication and was not otherwise an "aggrieved person" for purposes of challenging the second body-wire order. *State v. Klein*, 243 Or App 1, 10, 258 P3d 528 (2011). The Supreme Court affirmed that decision. 352 Or 302, 283 P3d 350 (2012).

We now have defendant's appeal before us, in which he raises the same suppression issue that his codefendant raised in *Klein*: whether the second body-wire order was unlawful because it was signed by a judge who, years before, had been the district attorney assigned to the then-unsolved case of the Bell shooting. Defendant, unlike Klein, was the subject of the second body-wire order and can challenge that order as an "aggrieved person." *See* ORS 133.721(1) ("'Aggrieved person' means a person who was a party to any wire, electronic or oral communication intercepted under ORS 133.724 or 133.726 or a person against whom the interception was directed and who alleges that the interception was unlawful."). Now reaching the merits of the issue, we conclude that the trial court correctly denied the motion to suppress. We also reject defendant's remaining contentions, some of which were also rejected by this court and the Supreme Court in *Klein*, and thus affirm defendant's convictions.[1]

## I. BACKGROUND

In 2002, Asia Bell, Tyrone James, and Robert Milhouse were shot on the front porch of the Bell residence. The facts surrounding the shooting are described in the Supreme Court's opinion in *Klein*, which we repeat here for purposes of background:

"[Klein] drove [defendant] to and from the scene of the crime. [Klein's] girlfriend at the time, Sonja Hutchens, served as a lookout during the shooting. [Klein] and [defendant] are gang members; the victims were associated with, although not members of, a rival gang.

"The police developed few leads in their investigation until 2006, when Hutchens, who then was serving a 10-month jail sentence for an unrelated crime, contacted the prosecutor to offer information about the murder in exchange for an early release. Hutchens identified [defendant] as the shooter; she did not identify [Klein] as the driver, nor did she acknowledge her role as lookout at that time. Based on the information that Hutchens supplied,

---

[1] In a *pro se* supplemental brief, defendant raises additional assignments of error in which he contends that he should have been allowed to play complete audiotapes of certain recorded conversations. We reject those arguments without discussion.

the police obtained an order under ORS 133.726, the body wire statute, to intercept oral communications between Hutchens and [defendant] by means of a body-wire worn by Hutchens.

"Before that order expired, the police applied for a second body-wire order, which is the subject of [Klein and defendant's challenges]. The application for the order described conversations between [defendant] and Hutchens that the police had intercepted previously. The application also stated that Hutchens had failed a lie detector test and had admitted to the police that she had misled them about several important facts regarding the murder. As relevant here, the application noted that Hutchens had stated that [Klein] had driven [defendant] and several other gang members to the house where the shooting occurred. The application also stated that Hutchens had admitted that she had followed [defendant] and [Klein] in a separate vehicle to serve as a lookout.

"Although the application for the order mentioned [Klein] and several other gang members who were present in the vehicle [during the shooting], the order did not name [Klein] or the other gang members. Rather, the order provided:

"'The persons whose oral communications are to be recorded are SONJA ELAINE HUTCHENS and DEPRINCE ROMEY HALE [defendant] and other unknown subjects who may be present during contacts by SONJA ELAINE HUTCHENS with DEPRINCE ROMEY HALE. This order authorizes only the interception of oral communications to which SONJA ELAINE HUTCHENS is a party, which means oral communications that are made in the immediate presence of DEPRINCE ROMEY HALE and are audible to DEPRINCE ROMEY HALE.'

"Judge Eric Bergstrom signed the order.

"Based on the order, the police placed a body-wire on Hutchens and recorded conversations between [defendant] and Hutchens. Those conversations implicated [Klein] in the murder. Based in part on those conversations, the police obtained a wiretap order under ORS 133.724, which authorized the interception of communications made by [Klein] on his mobile phone. [Klein] made incriminating

statements to Hutchens over his phone, which the police intercepted.

"Before trial, [Klein and defendant[2]] filed separate motions to suppress evidence gained from the body-wire order and the wiretap order. As to the body-wire order, [the codefendants] alleged that the order was invalid because Judge Bergstrom was not a neutral and detached magistrate. [The codefendants] asserted that, in 2002, at the time of the murder, Judge Bergstrom had been a deputy district attorney for Multnomah County, and that he had been called to the scene of the murder and had attended the autopsy. Because there were no suspects in the murder investigation until Hutchens came forward in 2006, however, the district attorney's office did not open a file on the case until after Judge Bergstrom had left his position as a prosecutor in 2005. The trial court denied [their] motion. As to the wiretap order, [the codefendants] alleged that evidence gained under that order should be suppressed because the application for the order had relied on evidence gained from the invalid body-wire to establish probable cause. Thus, [their] argument that the wiretap evidence should be suppressed depended on the court's agreement with [their] argument that the body-wire evidence was unlawfully obtained and should be suppressed. The trial court denied [their] second motion as well.

"At trial, Hutchens was a witness for the state. [The codefendants] sought to raise questions about Hutchens's credibility through the testimony of Aisha Banks, who had been incarcerated with Hutchens. Banks was prepared to testify that Hutchens told her that she had 'made up' information about the shooting in order to get out of jail. The trial court excluded the evidence as cumulative under OEC 613(2) on the ground that Hutchens had already admitted making those statements: Hutchens testified on the stand that she had lied repeatedly to the police and others regarding the events in question, and she admitted telling Banks that she made up 'this whole thing' in order to get out of jail."

352 Or at 303-06.

_____

[2] The court's decision in *Klein* refers only to Klein's motions; Klein and defendant were tried as codefendants and made similar, if not identical, arguments on the relevant issues.

Ultimately, Klein and defendant were both convicted for their roles in the crimes. Defendant was convicted of murder, attempted aggravated murder, and conspiracy to commit murder (which merged with the murder conviction). He was sentenced to life in prison with a mandatory minimum of 300 months in prison for the murder and, consecutively to that sentence, to two concurrent sentences of 121 months' imprisonment on the attempted aggravated murder convictions. He now appeals.

## II. ANALYSIS

### A. *Motion to Suppress*

In his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress evidence derived from the use of a body wire. Specifically, defendant contends that the second body-wire order was not signed by a "neutral and detached magistrate" and was therefore unlawful. For the reasons that follow, we are not persuaded that the court erred in denying defendant's motion to suppress.[3]

### 1. *Issues Presented*

We review the trial court's ruling on the motion to suppress for errors of law, and we are bound by the trial court's factual findings that are supported by sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The relevant facts, stated consistently with that standard, are as follows.

In October 2006, Detective Paul Weatheroy, an investigator in the cold case homicide unit, prepared an application for a body-wire order and presented that application *ex parte* to Judge Bearden, who signed it. *See*

---

[3] Defendant also contends that the second body-wire application did not demonstrate probable cause to believe that intercepting the communications would lead to evidence of a crime. The trial court rejected that argument, and so do we, without discussion. Furthermore, defendant contends that the second body-wire order was fatally defective because ORS 133.726 does not authorize extensions of existing body-wire orders (as opposed to the initial issuance); rather, he contends, ORS 133.724 sets out the pertinent requirements for extensions, which the second body-wire order did not meet. Defendant did not raise those contentions below in any form, nor do they amount to plain error.

ORS 133.726(3) ("An ex parte order for intercepting an oral communication in any county of this state under this section may be issued by any judge as defined in ORS 133.525 upon written application made upon oath or affirmation of the district attorney or a deputy district attorney authorized by the district attorney for the county in which the order is sought or upon the oath or affirmation of any peace officer as defined in ORS 133.005."). The order authorized police to obtain and record oral communications between Hutchens and defendant that, Weatheroy averred, were expected to yield evidence that defendant was responsible for the Bell shooting. *See* ORS 133.726(5) (judge may enter an *ex parte* order authorizing body-wire interception if the facts submitted by the applicant demonstrate "(a) [t]here is probable cause to believe that a person is engaged in committing, has committed or is about to commit a particular felony" and "(b) [t]here is probable cause to believe that the oral communication to be obtained will contain evidence concerning that crime"). The order was set to expire on November 5, 2006. *See* ORS 133.726(6)(e) (body-wire order must list "[a] period of time after which the order shall expire").

During the month of October 2006, defendant and Hutchens did not have any recorded conversations, but Weatheroy believed that such a conversation might take place the following month. On November 3, two days before the body-wire order was to expire, Weatheroy prepared a second application.[4] He was under the impression that Judge Bearden was in his chambers on that day and went to the courthouse intending to present the application to him. Weatheroy arrived at the courthouse between 4:00 and 5:00 p.m. that day—a Friday—and was walking to Judge Bearden's chambers when he encountered Judge Bergstrom in the hallway of the courthouse.

Judge Bergstrom had been a deputy district attorney in Multnomah County before becoming a judge,

---

[4] The November 2006 application contained all the information from the first application, as well as additional information, including Hutchens's phone contact with defendant and his suspicion that she was working with police. (Weatheroy later filed a third application in December 2006 that included information obtained from the second body wire, and the court issued that third body-wire order as well; the third order is not at issue on appeal.)

and he and Weatheroy had a professional relationship dating back to those days. In a brief exchange in the hallway, Judge Bergstrom asked what Weatheroy was doing at the courthouse, and the detective explained that he was attempting to get Judge Bearden's signature on an affidavit for a court order; Weatheroy did not tell Bergstrom the name of the case or disclose anything else about it at that time. Judge Bergstrom told Weatheroy that, if he had a difficult time finding a judge that afternoon, Bergstrom was going to be at a nearby restaurant and would be willing to review the affidavit.

Weatheroy then headed to Judge Bearden's chambers but found the office dark. The detective walked the floor looking for another sitting judge, but he was unable to find one. He later proceeded to the nearby restaurant in search of Judge Bergstrom. Weatheroy found Judge Bergstrom there, produced the body-wire application, and asked Judge Bergstrom whether he was still willing to review it. The judge agreed and took the document to an empty table where he reviewed it for approximately 10 to 15 minutes before signing it.

The issue in this case stems from the fact that Judge Bergstrom not only had been a deputy district attorney, but he had been the deputy district attorney assigned to the Bell investigation. At the time of the shooting in 2002, Bergstrom was a senior deputy district attorney supervising the investigation of gang-related crimes. When police responded to reports of the Bell shooting, Bergstrom was called to the crime scene as well. His role was to act in an advisory capacity, assisting the investigating officers if they had questions about conducting a search, and otherwise acting as a resource for the officers. Bergstrom saw Asia Bell's body at the crime scene and later attended her autopsy.

In 2005, Bergstrom was appointed to the Multnomah County Circuit Court as a judge. As of that time, no one had been charged in the Bell shooting; in fact, the case had been "cold" since March 2003. When Bergstrom left the district attorney's office, he left behind a file that included autopsy photographs and newspaper articles that he had clipped. The file did not include copies of investigative reports, but Bergstrom was nonetheless familiar with the investigators'

theory of the case: that it was instigated by a dispute over a dog fight, which led to the murder of Bingo Gonzales, which, in turn, led to the Bell shooting.

At the hearing on the motion to suppress, Judge Bergstrom testified that the body-wire order was the first time that he had seen Hutchens's or defendant's name in connection with the Bell shooting. In fact, he did not have an independent memory of recognizing any names in the body-wire application, but he was "very confident [he] would have recognized Asia Bell's name," which appeared throughout the application. Bergstrom testified that he was not "biased in any fashion" when reviewing the material, and that "[i]t's very second nature to [him]. Either probable cause is there or it's not." When asked on cross-examination whether he should have disqualified himself under the canons of judicial conduct, Judge Bergstrom responded in the negative, submitting that

> "I never acted as a lawyer in a court proceeding. There was never a case brought to the office for review. There was never a case that I entered into our system. There was never a case I grand juried. There was never a time I was prosecuting [defendant or Klein]."

In sum, Bergstrom viewed the matter like "hundreds of other warrants, where I'm just reading to see whether probable cause exists * * *."

Defendant, of course, disputed whether the circumstances were just like any other application for an order. In his motion to suppress, he argued that Judge Bergstrom's previous involvement in the Bell investigation "disqualified" him such that he "cannot hear any motion, cannot preside as a judge, cannot sign any search warrant." Specifically, defendant argued that, because the body-wire order "was not signed by a neutral and detached magistrate, it's [suppressed]. There's no other remedy." *See* ORS 133.736(1) (An "aggrieved person" may "move to suppress recordings of any oral communication intercepted in violation of ORS 133.726 or testimony or other evidence derived solely from the unlawful interception.").[5]

---

[5] Defendant's suppression arguments below regarding the "neutral and detached magistrate" were based primarily on constitutional grounds rather than a statutory suppression remedy, although he now advances, to a minimal extent, statutory arguments as well. *See* 252 Or App at 198 n 7. Defendant did not identify

The trial court agreed with defendant's predicate—that Judge Bergstrom was not a "neutral and detached magistrate"—but disagreed that suppression was an appropriate remedy under the circumstances:

"THE COURT: * * *. I think he falls into the category that he's not neutral and detached. I don't think he's very far in that category. I think he's in the first circle. And I don't think that it was a very serious fall.

"And I totally appreciate that if he hadn't been walking down the stairs at that exact moment, another judge would have been rounded up one way or another, and that other judge would have signed off.

"* * * * *

"I also find that the officer [Weatheroy] had no ulterior motive whatsoever in picking this judge. * * * It was happenstance. * * *.[6]

"I also find that although the red flags were there, the judge had no conscious awareness of any problem whatsoever. And so everybody, in my mind, was acting in good faith.

"However, there was a violation. I just find that because of the inevitable discovery and because the violation is so de minimus, that the constitution would never forbid the State from using the evidence that was garnered as a result of that. * * *"

On appeal, defendant lauds the trial court's initial reasoning that Judge Bergstrom was not "neutral and detached" but argues that, contrary to the trial court's ultimate ruling, (1) there is no "good faith" exception to the exclusionary rule under Oregon law, (2) the doctrine of inevitable discovery is inapposite in these circumstances, and (3) there is no such thing as a "*de minimis*" violation of the requirement of a "neutral and detached" magistrate. The

---

in the trial court, nor do the parties cite on appeal, any statutory language bearing on the meaning of "neutral and detached" in this context.

[6] Weatheroy, who had reviewed the file in the case prior to preparing the application, testified that he would have come across Bergstrom's name in the investigative file but that he was not specifically conscious of the connection at the time that he approached Judge Bergstrom in the restaurant; "it was nothing that I was mindful of on that particular date." The court found that testimony to be credible.

state, for its part, responds that Judge Bergstrom's previous involvement in the Bell investigation was too minimal to rise to the level of a constitutional violation, considering that "[i]n 2002, there existed neither case nor suspect on which to base a prosecution, and Bergstrom recalled almost nothing about the 2002 crimes when he signed the order in 2006." For the reasons that follow, we agree with the state that Judge Bergstrom was "neutral and detached" as that requirement is understood in the context of the issuance of warrants and standards of due process, and we therefore affirm the trial court's order denying suppression.[7]

2. *"Neutral and Detached"*

With respect to the issuance of warrants—and, for the sake of argument, we assume that the issuance of a body-wire order invokes an analogous standard, 252 Or App at 196 n 5, 198 n 7—the requirement of a "neutral and detached" magistrate is described in two lines of cases. *See United States v. Bowers*, 828 F2d 1169, 1174 (6th Cir 1987), *cert den*, 486 US 1006 (1988) (explaining that "cases addressing the 'neutral and detached' requirement fall into two primary categories").

a. Severance from Law Enforcement Activities

---

[7] Defendant's arguments derive from state and federal search and seizure case law and, indeed, the explicit premise of defendant's arguments—at least in his opening brief—is that a body-wire order is "both a search and seizure" for purposes of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The state, in response, asserts that a body-wire order, unlike a wiretap, involves a consenting participant (Hutchens, in this case) and therefore did not invade defendant's constitutionally protected privacy interests. *See, e.g., United States v. Caceres*, 440 US 741, 744, 99 S Ct 1465, 59 L Ed 2d 733 (1979) (United States Constitution does not "require[ ] that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants"). In his reply brief, and then in a supplemental memorandum of additional authorities, defendant contends that, regardless of whether the body-wire order involves a "search" for constitutional purposes, due process and the body-wire statutes demand the same "neutral and detached" magistrate as a search warrant. Because we reject defendant's understanding of the "neutral and detached" requirement in any event, we need not resolve whether (1) the body-wire constituted a search or seizure under the state or federal constitution; or (2) the body-wire statute incorporates the requirement of a "neutral and detached" magistrate by requiring that a "judge," as defined in ORS 133.525(1), issue the order.

The first strain of "neutral and detached" magistrate case law is epitomized by *Coolidge v. New Hampshire*, 403 US 443, 91 S Ct 2022, 29 L Ed 2d 564 (1971), a Fourth Amendment case in which the New Hampshire Attorney General issued search warrants in a high-profile murder case that he was personally investigating and later prosecuted at trial. Under the relevant New Hampshire law, all justices of the peace were authorized to issue search warrants, and the New Hampshire Attorney General, acting as a justice of the peace, issued warrants that yielded incriminating evidence as to the defendant. The Supreme Court, *quoting Johnson v. United States*, 333 US 10, 13-14, 68 S Ct 367, 92 L Ed 436 (1948), explained that the Fourth Amendment entrusts probable cause determinations to judicial officers, not law enforcement:

> "'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers * * * *When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.*'"

*Coolidge*, 403 US at 449 (omission in *Coolidge*; emphasis added).

By that standard, the warrant issued by the New Hampshire Attorney General in *Coolidge* ran afoul of constitutional protections:

> "In this case, the determination of probable cause was made by the chief 'government enforcement agent' of the State—the Attorney General—who was actively in charge of the investigation and later was to be chief prosecutor at the trial. * * * Without disrespect to the state law enforcement

agent here involved, the whole point of the basic rule so well expressed by Mr. Justice Jackson [in *Johnson*] is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations—the 'competitive enterprise' that must rightly engage their single-minded attention."

403 US at 450.

Similarly, in *Lo-Ji Sales, Inc. v. New York*, 442 US 319, 326-27, 60 L Ed 2d 920, 99 S Ct 2319 (1979), the Court explained that judicial officers cannot simply "rubber stamp" the activities of law enforcement but must instead exercise their own independent judgment when presented with an application to search. In *Lo-Ji Sales, Inc.*, a town justice had accompanied officers to the crime scene to assist them in enforcing an open-ended warrant. The Court held that, under the circumstances, the justice did not "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure." *Id.* at 326.

The thread running through Fourth Amendment cases like *Coolidge* and *Lo-Ji Sales, Inc.* is this: "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa,* 407 US 345, 350, 32 L Ed 2d 783, 92 S Ct 2119 (1972).

b. Due Process

In a second line of cases, the requirement of a "neutral and detached" magistrate is grounded in due process principles under the Fourteenth Amendment. The best example is *Connally v. Georgia*, 429 US 245, 250, 97 S Ct 546, 50 L Ed 2d 444 (1977), a case in which the Supreme Court addressed a fee-for-warrant system in Georgia. Relying on two earlier Fourteenth Amendment cases, *Tumey v. Ohio*, 273 US 510, 523, 47 S Ct 437, 71 L Ed 749 (1927), and *Ward v. Village of Monroeville*, 409 US 57, 93 S Ct 80, 97 S Ct 546 (1972), the Court held that, by paying justices of the peace for the issuance (but not the denial) of warrants, Georgia had unconstitutionally incentivized the process:

"The present case, of course, is not precisely the same as *Tumey* or as *Ward*, but the principle of those cases, we conclude, is applicable to the Georgia system for the issuance of search warrants by justices of the peace. The justice is not salaried. He is paid, so far as search warrants are concerned, by receipt of the fee prescribed by statute for his *issuance* of the warrant, and he receives nothing for his *denial* of the warrant. His financial welfare, therefore, is enhanced by positive action and is not enhanced by negative action. The situation, again, is one which offers 'a possible temptation to the average man as a judge * * * or which might lead him not to hold the balance nice, clear and true between the State and the accused.' It is, in other words, another situation where the defendant is subjected to what surely is judicial action by an officer of a court who has 'a direct, personal, substantial, pecuniary interest' in his conclusion to issue or to deny the warrant. *See Bennett v. Cottingham*, 290 F Supp 759, 762-763 (ND Ala 1968), *aff'd*, 393 US 317 (1969)."

429 US at 250 (emphasis and omission in *Connally*).

However, as the Supreme Court recently explained in *Caperton v. A. T. Massey Coal Co., Inc.*, 556 US 868, 129 S Ct 2252, 173 L Ed 2d 1208 (2009), cases like *Tumey*, *Ward*, and *Connally* are exceptional cases; "'most matters relating to judicial disqualification [do] not rise to a constitutional level.'" *Caperton*, 556 US at 876 (quoting *FTC v. Cement Institute*, 333 US 683, 702, 68 S Ct 793, 92 L Ed 1010 (1948)). The due process standard described in *Tumey* and similar cases reflected the common-law maxim that "'[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.'" *Caperton*, 556 US at 876 (quoting Federalist No 10, p 59 (J. Cooke ed. 1961) (J. Madison) and citing Frank, *Disqualification of Judges*, 56 Yale L J 605, 611-612 (1947)). That common-law rule was limited to circumstances in which the judge had a direct interest in the outcome of the proceeding: "[p]ersonal bias or prejudice 'alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.'" *Id.* (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 US 813, 820, 106 S Ct 1580, 89 L Ed 2d 823 (1986)).

Over time, the Court recognized additional instances that, short of direct interest in the outcome, nevertheless "as an objective matter, require recusal. These are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Caperton*, 556 US at 872 (quoting *Withrow v. Larkin*, 421 US 35, 47, 95 S Ct 1456, 43 L Ed 2d 712 (1975)). *Tumey, Ward*, and *Connally*—in which the decisionmaker was compensated differently depending on the outcome of the proceeding—were such cases. Although "the interest was less than what would have been considered personal or direct at common law," it was nonetheless sufficient to compromise the fairness of the proceedings for constitutional purposes. 556 US at 877-78.

"The second instance requiring recusal that was not discussed at common law emerged in the criminal contempt context, where a judge had no pecuniary interest in the case but was challenged because of a conflict arising from his participation in an earlier proceeding." *Id.* at 880. In that circumstance, "[t]he judge's prior relationship with the defendant, as well as the information acquired from the prior proceeding, [is] of critical import." *Id.* at 881. If the trial judge makes a charging decision as a single-person "grand jury," *In re Murchison*, 349 US 133, 136, 75 S Ct 623, 99 L Ed 942 (1955), or becomes embroiled in a controversy that would make it unlikely that the judge will maintain that calm detachment necessary for fair adjudication, *Mayberry v. Pennsylvania*, 400 US 455, 466, 91 S Ct 499, 27 L Ed 2d 532 (1971), then due process requires a different judge to try the contempt charges. Yet, even in the contempt context, "not every attack on a judge * * * disqualifies him from sitting." *Mayberry*, 400 US at 465; *See Caperton*, 556 US at 881 (distinguishing *Ungar v. Sarafite*, 376 US 575, 584, 84 S Ct 841, 11 L Ed 2d 921 (1964), a case in which a lawyer's challenge, although "disruptive, recalcitrant and disagreeable commentary," was not "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification").

In both the criminal contempt and financial interest cases, the due process inquiry "is an objective one. The Court

asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 US at 881. To answer that question, the Court "has asked whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.* at 883-84 (quoting *Withrow*, 421 US at 47).

To summarize, the two lines of "neutral and detached" cases have required (1) that the issuing magistrate be "sever[ed] and disengage[d] from activities of law enforcement"; and (2) that, as a matter of due process, the issuing magistrate not have an interest in the case that would corrupt the integrity of an average judge. Returning now to the facts in this case, we conclude that Judge Bergstrom's prior involvement in the Bell investigation did not violate either of those standards.[8]

### 3. *Bergstrom as "Neutral and Detached" Magistrate*

At the time that Judge Bergstrom reviewed the body-wire application, he had no affiliation with law enforcement. He was a judge in Multnomah County and was

[8] The parties do not direct us to, and we are not aware of, any Oregon appellate decisions exploring the "neutral and detached" magistrate requirement for search warrants or intercept orders. In *State v. Burnam*, 66 Or App 132, 672 P2d 1366 (1983), we considered, on a state's appeal, whether suppression was the appropriate remedy for evidence discovered pursuant to a warrant issued by a magistrate whose own clerk was the rape victim in the case. In a footnote, we explained that the "neutral and detached" question was not presented on appeal: "The state does not appeal the finding of fact that Justice of the Peace Baumeister did not act as a neutral and detached magistrate at the time he signed the search warrants in question. It is clear that he did not." 66 Or App at 135 n 1.

Nor does defendant develop any argument that the state law standard—by statute or under the constitution—should be analyzed differently from federal search and seizure case law, and we therefore express no opinion on that matter. *See Redwine v. Starboard, LLC*, 240 Or App 673, 682, 251 P3d 192 (2011) (addressing only the federal standard where, despite "invok[ing] the privilege under Article I, section 12, as well as the Fifth Amendment, both parties have conflated their analyses of the two constitutional provisions, with neither proposing a distinct analysis under Article I, section 12, or arguing against our adoption of the federal standard"); *see also State v. Kennedy*, 295 Or 260, 268, 666 P2d 1316 (1983) ("Although responsible treatment of the state claim is preferable, as stated above, if it is abandoned the court can note that fact so that the decision at least will not be a precedent on the issue.").

severed entirely from the police and district attorney's office. Moreover, defendant does not contend that Judge Bergstrom simply "rubber stamped" the application. The evidence in the record is that Judge Bergstrom independently reviewed the application for 10 to 15 minutes before signing the order. In short, this case is a far cry from those in which a magistrate's neutrality and detachment are questioned on the ground that, at the time of the issuance of the warrant, the magistrate was acting as an extension of law enforcement.

The closer question is whether, given Judge Bergstrom's prior involvement in the shooting investigation—including visiting the crime scene, attending the autopsy, clipping newspaper articles regarding the murder, and otherwise acting as the assigned attorney for the investigation—the "probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*, 556 US at 877 (internal quotation marks and citation omitted). Again, though, the question is not whether the trial court should have avoided any appearance of bias or even whether the Oregon Code of Judicial Conduct would have required Judge Bergstrom to recuse himself.[9] Rather, the question is whether, "under a realistic appraisal of psychological tendencies and human weakness," the average judge in Judge Bergstrom's position, *i.e.*, a judge with his level of involvement as a previously assigned district attorney on the murder investigation, "is likely to be neutral, or whether there is an unconstitutional potential for bias." 556 US at 881 (internal quotation marks and citation omitted).

Applying that standard, we are not persuaded that Judge Bergstrom's involvement in the Bell investigation—all of which occurred before a suspect was ever identified—rises to the level of a due process violation. At the time he was assigned

_____

[9] *See Caperton*, 556 US at 889-90 (explaining that due process "demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification[.] * * * Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution. Application of the constitutional standard implicated in this case will thus be confined to rare instances." (Internal quotation marks and citations omitted.)). The requirements of the Oregon Code of Judicial Conduct are not before us, and we do not intend to express any opinion in that regard.

to the Bell investigation in 2002, Bergstrom was handling 12 other pending murder cases. From the time he responded to the crime scene until he left the district attorney's office, there were no identified suspects in the Bell case, and Bergstrom had not seen defendant's or Hutchens's name associated with the murder. His file on the case included a medical examiner's report, autopsy photographs, and newspaper clippings, but no investigative reports. Because there were no suspects, Bergstrom was never asked to formally review the file regarding a charging decision. Viewed objectively, there is no evidence that, at the time Bergstrom reviewed the body-wire application, he had anything personally or professionally at stake in the outcome of a prosecution, or had anything more than a passing familiarity with some of the names and possible motives involved.

Although defendant makes much of the fact that Judge Bergstrom attended the autopsy and saw Asia Bell's body at the crime scene, those facts must be considered in the context of his experience and the circumstances of the viewings. As a prosecutor, Bergstrom had handled approximately 50 murder cases, routinely attended autopsies, and had visited hundreds of crime scenes. Bergstrom testified, and we do not doubt, that seeing murder victims has an emotional effect on the viewer. That said, we cannot say that, "under a realistic appraisal of psychological tendencies and human weakness," the viewing of the crime scene and Asia Bell's body would, four years later, likely bias someone with Judge Bergstrom's experience when reviewing an application for a body wire.

Finally, we note that defendant has not provided, and we are not aware of, any case in which an otherwise lawful search warrant or intercept order has been invalidated based on such limited, past investigatory involvement by the issuing magistrate. Indeed, the most analogous cases are to the contrary. In *United States v. Young*, 877 F2d 1099, 1104 (1st Cir 1989), the court concluded that the issuing magistrate was "neutral and detached" despite the fact that he had earlier provided advice to law enforcement during the investigation. In that case, a state police lieutenant "phoned Justice Gage * * * and asked Gage about the legal effect of holding incommunicado for several hours two persons [the

lieutenant] had just arrested. Gage answered the question." *Id.* A few hours later, police again called on Justice Gage and obtained the search warrant. The defendant contended that "the first of these calls somehow biased Justice Gage, depriving him of that 'neutral and detached' quality that the Fourth Amendment demands in one issuing a warrant." *Id.* The First Circuit disagreed:

> "We do not see how one can equate Gage's legal answer to the first call with loss of neutrality or detachment at the point of issuing the warrant. Although New Hampshire recognizes that judges should not make a practice of advising law enforcement officers on such matters— such advice should come from the attorney general's office—the advice given here does not seem to us to have any significant bearing on Gage's disinterest when he considered the warrant application. *Cf. Shadwick*, [407 US at 351] (judge issuing warrant must act as a neutral member of the judicial branch, independent of the police or the prosecution); *Coolidge*, [403 US at 449-53] (officer issuing warrant must not be prosecutor)."

877 F2d at 1104 (internal citation omitted).[10]

Courts also have upheld search warrants despite the fact that the issuing magistrate either prosecuted or defended the defendant in a prior proceeding. For example, in *United States v. Outler*, 659 F2d 1306, 1312 (5th Cir 1981), *cert den*, 455 US 950 (1982), a magistrate issued a search warrant as part of an investigation of a doctor despite the fact that the magistrate previously prosecuted that same doctor for a probation violation that, like the subsequent investigation, concerned the legitimacy of the doctor's medical practice. The court upheld the validity of the search warrant. 659 F2d at 1312. Likewise, in *United States v. Harris*, 566 F3d 422, 433 (5th Cir 2009), *cert den*, ___ US ___, 130 S Ct 1687 (2010), the defendant argued that the district court judge who issued the warrant did not qualify as a "neutral and detached" magistrate because "he represented [the defendant] in two felony cases involving

---

[10] The court went on to explain that the "conclusive answer" to the defendant's argument was that, although there was "some evidence that suggests that Justice Gage might have known that the police officer's call and [the] later warrant application were connected," the district court's finding that Justice Gage made no connection between the two was not "clearly erroneous." 877 F2d at 1104.

drug possession and delivery in 1997." The Fifth Circuit rejected the argument, explaining that,

> "[a]bsent any indication of prejudice, we see no reason to question the neutrality and detachment of a magistrate who happened to have represented the defendant in an unrelated criminal matter six years prior to the issuance of the warrant at issue. *See, e.g., United States v. Barry-Scott*, 251 F App'x 983, 992-93 (6th Cir 2007) (unpublished) (holding that a judge issuing a search warrant was sufficiently neutral and detached, even though he had previously represented the defendant in another drug case); *United States v. Heffington*, 952 F2d 275, 278-79 (9th Cir 1991) (finding no constitutional defect in the warrant when the issuing magistrate had previously represented one of the defendants in another narcotics case as a federal defender)."

566 F3d at 433-34.[11]

Although those "past involvement" cases are not a perfect match, they, along with the United States Supreme Court's case law, convince us that Judge Bergstrom was a sufficiently "neutral and detached" magistrate as that phrase has been applied in the search and seizure context. Thus, we reject defendant's contention that the second body-wire order, issued by Judge Bergstrom, was unlawful and instead affirm the trial court's denial of the motion to suppress evidence derived from that order.

B. *Impeachment Evidence*

In his second and third assignments of error, defendant contends that the trial court should have permitted

---

[11] In *Harris*, 566 F3d at 434, the court also rejected the argument that the more-demanding federal recusal statute, 28 USC § 455(a), was applicable:

"The 'statutory disqualification standard [is] more demanding than that required by the Due Process Clause' and thus does not guide our constitutional analysis here. *United States v. Couch*, 896 F2d 78, 81 (5th Cir 1990). Moreover, even assuming that the analogy with the federal recusal statute was persuasive, we and other appellate courts have rejected challenges based on 28 USC § 455(a) in similar circumstances. *See United States v. Outler*, 659 F2d 1306, 1312 (5th Cir 1981) (holding that a magistrate judge issuing a search warrant was not obligated to disqualify himself because he had previously represented the government in an unrelated probation revocation hearing against the defendant); *see also United States v. Guthrie*, 184 F App'x 804, 807-08 (10th Cir 2006) (unpublished) (rejecting similar challenge under 28 USC § 455(a) when the issuing magistrate had previously represented the defendant in an unrelated criminal matter)."

him to call two witnesses, Aisha Banks and Ashley Coleman, who would have impeached Hutchens by testifying that Hutchens eventually admitted fabricating her story to stay out of jail. Defendant acknowledges that we rejected the same impeachment arguments in *Klein* on the ground that the evidence "was not 'different in nature' from the evidence that was admitted and, thus, its exclusion was unlikely to have affected the verdict." 243 Or App at 15 (quoting *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003)).[12] Nonetheless, defendant contends that we misunderstood the nature of the impeachment evidence and should revisit the question.

In affirming our decision in *Klein*, the Supreme Court concluded that this court had indeed "understated the difference between Banks's and Hutchens's testimony when [we] stated that Banks's testimony—that Hutchens fabricated information about the shooting to get out of jail—would have demonstrated 'exactly the same thing' as Hutchens's testimony about those statements." 352 Or at 314. Rather, the court explained, "Banks's testimony would have provided a different perspective and a different emphasis than Hutchens's testimony." *Id.* That said, the Supreme Court reached the same conclusion that we did regarding harmlessness: "Nevertheless, because the jury heard the same facts—the content of Hutchens's statements and that those statements were made in jail to a fellow inmate—when Hutchens admitted making those statements on the stand, any error in excluding the evidence is unlikely to have affected the jury's verdict." *Id.*

We likewise conclude that any error in excluding the impeachment evidence from Banks and Coleman was harmless, considering that the jury heard the same facts when Hutchens took the stand. Accordingly, we reject defendant's second and third assignments of error.

C. *Corroboration of Accomplice Testimony*

In his fourth assignment of error, defendant contends that the trial court should have entered a judgment

---

[12] The challenge in *Klein* involved only the testimony of Banks, and not Coleman, but that difference is not material to our analysis. Both Banks and Coleman were in custody with Hutchens and would have provided the same impeachment evidence: that, in custody, Hutchens admitted fabricating her story to stay out of jail.

of acquittal on each count of the indictment because the state failed to corroborate the testimony of Hutchens, an accomplice. *See* ORS 136.440(1) ("A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of commission."). We rejected that same argument in *Klein* and, for the same reasons, again conclude that the evidence "was sufficient to corroborate Hutchens' testimony" concerning defendant's participation in the crimes. 243 Or App at 12.

Affirmed.